CRST, INC., Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellee.

No. 89–2488.

United States Court of Appeals, Eighth Circuit.

Submitted March 15, 1990.

Decided July 26, 1990.

---

Robert E. Konchar, Cedar Rapids, Iowa, for appellant.

Teresa T. Milton, Washington, D.C., for appellee.

Before McMILLIAN and BEAM, Circuit Judges, and LARSON,* Senior District Judge.

BEAM, Circuit Judge.

CRST, Inc. appeals from the decision of the tax court upholding the Commissioner's assessment of deficiencies in CRST's federal income tax payments for the years 1977–1980. The only issue on appeal involves the Commissioner's disallowance of CRST's claim of an abandonment loss under section 165 of the Internal Revenue Code of 1954, as in effect during the relevant tax years. We affirm.

## I. BACKGROUND

CRST is an Iowa motor carrier engaged in the interstate transportation of many types of goods. As a motor carrier operating in interstate commerce, CRST must have certificates of public convenience and necessity, otherwise known as operating authorities. An operating authority is required for each route traveled and for each commodity carried. CRST acquired hundreds of operating authorities since entering the trucking business in 1953. CRST also had many temporary operating authorities, each of which was effective during the pendency of an application for permanent authority. In 1980, CRST had approximately 510 permanent operating authorities with combined bases for tax purposes of at least $3,645,488.25.[1] The temporary operating authorities were not capitalized and, thus, had no bases.

Prior to 1980, operating authorities were difficult to obtain. The Interstate Commerce Commission (ICC) required carriers seeking new operating authority to demonstrate that additional services of the type for which authority was sought were necessary. Existing carriers had the right to intervene and oppose applications for new authorities. In this period, carriers could purchase existing authorities from other carriers. By doing so, a carrier was able to enter a new market without incurring the substantial expense of the ICC application process. Thus, existing permanent authorities were valuable assets.

As of July 1, 1980, the Motor Carrier Act of 1980, Pub.L. No. 96–296, 94 Stat. 793 (1980) deregulated the motor carrier industry. Under the Act, operating authorities became easier to obtain. The burden of proof in the application process shifted to carriers opposing the application. Now, the ICC issues new authorities unless existing carriers can show that they are unnecessary. See 49 U.S.C. § 10922(b) (1982). The ICC approves in excess of ninety-nine percent of all such applications. As it be-

---

\* The HONORABLE EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation.

1. CRST asserted that the combined bases of its authorities totalled $3,660,929. However, the tax court found that the evidence supported a finding of $3,645,488.25. Because we affirm the denial of the deduction, the discrepancy is irrelevant.

came easier to obtain new authorities from the ICC, the market for existing authorities dwindled, and their value decreased dramatically.

On October 9, 1980, CRST applied for a new national operating authority (referred to as "Sub 769" authority) to replace all of its then existing authorities. In anticipation of receiving Sub 769 authority before the end of 1980, CRST determined that its existing operating authorities were worthless. CRST held a special meeting of its board of directors on November 3, 1980, and declared its operating authorities obsolete and a complete loss, the loss to be recognized in tax year 1980. Thus, CRST claims to have abandoned all of its permanent operating authorities by the end of 1980.

The application process, however, did not proceed so quickly. Notice of CRST's application was published in the Federal Register on November 4, 1980. Twenty-four statements of protest regarding the application were filed before the December 19, 1980, deadline. CRST had until January 3, 1981, to respond to the protests. In the absence of special circumstances requiring an extension, the ICC had 180 days in which to grant or deny the application. The ICC approved the Sub 769 application on May 12, 1981.[2]

After deregulation, federal law still required operating authorities for each route and commodity. CRST asserts that, to satisfy this requirement, it planned to operate under existing temporary authorities be-

tween the time it abandoned its old operating authorities and the time Sub 769 authority was granted. CRST's temporary operating authorities, however, did not cover all of its routes and commodities. Thus, CRST had to use some of the abandoned authorities during the first five months of 1981, before the receipt of the Sub 769 authority.

CRST claimed a $3,660,929 abandonment loss in 1980 to reflect the write-off of its operating authorities.[3] The Commissioner disallowed the loss and asserted a deficiency of $477,036 for 1980.[4] CRST petitioned the tax court for review of the deficiency assessment. The tax court found CRST's claim that it intended to abandon its operating authorities before the Sub 769 authority was issued to be incredible because without such operating authorities CRST would have been unable to lawfully continue its operations. Thus, the tax court upheld the deficiency assessment.

## II. DISCUSSION

CRST's main contention on appeal is that the tax court erroneously held that it did not abandon its operating authorities in 1980.

The tax court noted that an abandonment loss under section 165 requires both an intent to abandon the asset and an affirmative act of abandonment. *See A.J. Indus. v. United States*, 503 F.2d 660 (9th Cir. 1974). The tax court found, as a matter of fact, that CRST did not establish that it

**2.** No explanation for the delay in approving the Sub 769 application appears in the record.

**3.** CRST claimed a deductible loss under section 165(a) of the Internal Revenue Code of 1954 which provided: "There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise." The Treasury Regulations provided further support for such a deduction.

A loss incurred in a business or in a transaction entered into for profit and arising from the sudden termination of the usefulness in such business or transaction of any nondepreciable property, in a case where such business or transaction is discontinued or where such property is permanently discarded from use therein, shall be allowed as a deduction under section 165(a) for the taxable year in which

the loss is actually sustained. For this purpose, the taxable year in which the loss is sustained is not necessarily the taxable year in which the overt act of abandonment, or the loss of title to the property, occurs.
Treas.Reg. § 1.165–2(a) (1960).

**4.** The disallowance of the abandonment loss changed CRST's net loss for 1980 into a gain. Certain carrybacks of tax credits from 1980 to 1977–1979 also were disallowed which caused deficiencies in those years. The commissioner allowed a deduction of $366,093 under the Economic Recovery Tax Act of 1981, Pub.L. No. 97–34, § 266, 95 Stat. 172, 265–66 (1981), which was enacted after CRST claimed the disputed loss and provided for a sixty-month amortization of authorities. The resulting deficiency for 1977–1980 is $929,186.

had actually abandoned its permanent operating authorities. We review factual findings for clear error and reverse only when we have a "definite and firm conviction that a mistake has been committed." *RTS Inv. Corp. v. Commissioner*, 877 F.2d 647, 651 (8th Cir.1989) (per curiam) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)).

The evidence at trial clearly established that the value of CRST's operating authorities was greatly diminished by deregulation. CRST's president and its expert witness both testified that the operating authorities were of no value after 1980. The Commissioner does not dispute that the value of the authorities decreased. However, the tax court held that the decrease in value of the authorities did not render them worthless. Thus, to establish its entitlement to a deduction under section 165, CRST had to establish that it abandoned the operating authorities. *See* Treas.Reg. § 1.165–2(a).

CRST claims that the following evidence established that it intended to abandon the operating authorities: 1) the board of directors' resolution; 2) the application for Sub 769 authority, the granting of which was a ministerial function; 3) the fact that the loss had to be recognized in the year it was incurred; 4) the articles in trade magazines indicating that an ICC commissioner believed that motor carriers should operate as if the ICC did not exist; and 5) the Financial Accounting Standards Board's advice that operating authorities should be charged to income.

CRST also offered a traffic study to prove that it was operating on temporary authorities between the end of 1980, when it claims to have abandoned its permanent authorities, and May 12, 1981, when the Sub 769 authority was issued, and that only a small portion of the abandoned operating authorities were used after 1980. CRST also claims that the evidence clearly established that it completed the acts necessary to abandon the assets.

■ The Commissioner's deficiency assessment is entitled to a presumption of correctness. *See Long v. Commissioner*, 757 F.2d 957, 959 (8th Cir.1985) (per curiam). After carefully reviewing the record and studying the exhibits offered by CRST, we conclude that the findings of the tax court are not clearly erroneous. CRST's evidence of abandonment was not sufficient to overcome the presumption of correctness afforded the deficiency assessment.

CRST's contention that between the end of 1980 and the time Sub 769 authority was granted it intended to operate solely on temporary operating authorities is difficult to swallow. At the time CRST claims to have abandoned all of its permanent operating authorities, it did not know what commodities it would be carrying over what routes or when the Sub 769 authority would be granted. On the record there is no indication that CRST even knew what commodities and what routes were covered by its temporary operating authorities. Thus, CRST could not have reasonably intended to abandon its permanent authorities without knowing that it could lawfully conduct business under its temporary authorities.

■ Alternatively, CRST contends that the tax court should have allowed a deduction for the permanent operating authorities which its traffic study indicated were not used after 1980. Each authority was an individual asset that CRST could have abandoned. Had CRST established that it abandoned a certain authority, a deduction would be proper.

To prove which permanent authorities were in fact not used, and, thus, were abandoned, CRST prepared, as indicated, the traffic study. It consisted of an after-the-fact assignment of temporary operating authorities (or permanent authorities when no temporary existed for that carriage) to a one-in-ten sample of freight bills dated between December 31, 1980, and May 12, 1981. Testimony indicated that in ICC audits the one-in-ten sample is sufficient to establish that a carrier is operating in compliance with its operating authorities. The tax court, however, found that the study did not establish which perma-

nent operating authorities were not used after 1980.

We agree with the tax court that the study does not clearly establish which permanent operating authorities were not used in 1981. While the study represents ten percent of the shipments between the end of 1980 and May 12, 1981, it does not indicate, in any manner, that permanent authorities were not used for some or all of the other post–1980 shipments. Perhaps it bears repeating that the ten percent study indicated that at least some of the permanent authorities were, indeed, used after 1980.

CRST had the difficult task of proving that it abandoned operating authorities in 1980 that it needed to continue its operations in 1981. CRST failed.

### III. CONCLUSION

We have reviewed CRST's other arguments and find no error in the tax court's opinion. The judgment of the tax court is affirmed.