B. PHILIP CITRON AND EMILY K. CITRON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 626-88.          Filed August 5, 1991.

*Mortimer L. Laski, Kenneth G. Gordon,* and *Murray H. Falk,* for the petitioners.
*James S. Yan,* for the respondent.

GERBER, *Judge:* Respondent, in a statutory notice of deficiency, determined a $34,089 Federal income tax deficiency and a $1,704.45 addition to tax under section 6653(a)(1)[1] for petitioners' 1981 taxable year. Respondent also determined an additional 50 percent of the interest due on the $34,089 deficiency under section 6653(a)(2) for the 1981 taxable year. The entire deficiency is attributable to the disallowance of a loss claimed by petitioners in connection with the Vandom Productions partnership. The primary issue for our consideration is whether petitioners are entitled to a loss either due to a theft or embezzlement or, in the alternative, due to abandonment. If petitioners are entitled to a loss, secondary issues involve the amount of the loss and whether it should be characterized as capital or ordinary.

### FINDINGS OF FACT

The parties' stipulation of facts and attached exhibits are incorporated by this reference. Petitioners, who at all pertinent times were husband and wife, had their legal residence at 1490 Kenmore Road, Pasadena, California, at the time the petition was filed in this case. They filed a joint Federal income tax return for the 1981 taxable year. Petitioner B. Philip Citron (petitioner when used in the singular shall refer to B. Philip Citron) is a physician specializing in gastroenterology. He is the head of the gastroenterology department at Glendale Adventist Medical Center which is part of the Glendale Adventist Church. Emily Citron, a physician and the head of the pediatric chest disease department at Lake County Hospital, had no

---

[1] Unless otherwise indicated, section references are to the Internal Revenue Code of 1954 as amended and in effect for the taxable period under consideration. All Rule references are to the Tax Court Rules of Practice and Procedure.

involvement in petitioner's investment in the Vandom Productions partnership (Vandom).

Petitioner became a limited partner in Vandom, a California limited partnership, on September 26, 1980, by the cash investment of $60,000. In addition to petitioner, at all times pertinent herein, there were three additional limited partners in Vandom, two of whom had also invested $60,000 in cash and one of whom had invested $90,000 in cash. Each of the four limited partners was entitled to a 10-percent share in the profits of Vandom. The general partner was entitled to any profits in excess of the combined 40-percent share of the limited partners. Each limited partner who invested $60,000 was entitled to 22.2 percent of losses and ownership of Vandom's capital. The limited partner who invested $90,000 was entitled to 33 percent of losses and ownership of Vandom's capital. Petitioner obtained the $60,000 by means of a loan from Crocker National Bank. Petitioners claimed a $12,213 interest deduction on their 1981 income tax return concerning the $60,000 loan from Crocker National Bank. No promissory notes or obligations were assumed by or for Vandom by the limited partners. No funds necessary for Vandom's operation were borrowed. Instead, Vandom's operation was funded by the capital contributions of the four partners.

The general partner of Vandom was Vandom, Inc. Robert Burge (Burge) was president of Vandom, Inc. Burge was a motion picture producer and director at the time Vandom was formed. At the time of trial, he had made four motion pictures and about 100 television commercials and was working on a movie entitled "Keaton's Cops," starring Lee Majors, Abe Vigoda, and Don Rickles. Burge was also the president of Vandom Pictures, Inc., a Texas corporation, which eventually acquired the assets of Vandom, Inc. Vandom Pictures, Inc., was in the business of producing and distributing motion pictures.

The purpose of Vandom was to produce a motion picture to be named "Girls of Company C," also known as "The Girls of Charley Company." Burge wrote and developed the script for the motion picture in February 1980. The filming was completed in September 1980 and was the only movie made or activity conducted by Vandom. The completed

movie film is referred to in the industry as the "negative." Upon the completion of Vandom's activity concerning the negative, it was in the possession of Pacific Film Lab, a company in which neither Vandom nor Vandom, Inc., had an interest. In May 1981 Burge asked Pacific Film Lab for the negative for purposes of cutting and editing.

Joe Bardo (Bardo), doing business through a corporation known as "Millionaire Productions" (Millionaire), was an executive producer of the movie. Bardo was responsible for supplying the "below-line" services, which includes all services other than those provided by actors, producers, and directors (which are the "above-line" services). The above-line costs came out to about $47,000 and the below-line costs came out to about $153,000. Vandom, Inc., paid $140,000 on behalf of Millionaire for the below-line costs. Vandom incurred expenses of $249,167.80 for the production of the movie during 1980. Vandom's 1981 partnership return reflected $24,392 in accounts receivable as of the beginning of 1981. Bardo was also the subdistributor and videotape distributor of the movie. After the negative was delivered to Bardo, Burge made several requests for its return, which Bardo did not heed. Burge also had prior dealings with Bardo involving two other movies, and Burge believed that Bardo had improperly sold foreign rights to those movies and had not remitted money owed to Burge or his related entities.

At the time of Bardo's refusal to return the negative, Vandom retained a work print of the movie (a copy of the negative), which cannot be used to generally and commercially reproduce and release the type of movie Vandom was attempting to make. Burge advised the Vandom limited partners of Bardo's refusal and told them that the movie could not be made without the negative. Subsequently, Burge met three times with the limited partners between July and the end of December 1981. At the third meeting Burge explained that his attorneys' efforts to obtain the negative had been unsuccessful and that Bardo would not answer Burge's telephone calls. The limited partners were

advised that an expensive[2] and lengthy lawsuit would have to be brought against Bardo to recover the negative. Burge also advised the limited partners that with additional investment[2] an X-rated version of the movie could be made from the work print which might allow the recovery of a portion of the investment in Vandom.

Petitioner had no expertise in the movie industry and relied upon Burge's statements. The limited partners had no contractual requirement to advance additional money beyond their $60,000 investments. Petitioner and the other three limited partners decided that they did not want to advance additional money or participate in the conversion of the work print to an X-rated film. Petitioner believed that it could damage his professional reputation and jeopardize his position with Glendale Adventist Medical Center, where he was the only "non-Adventist" on the staff of an Adventist Church affiliated hospital. At that same third meeting during December 1981, petitioner advised Burge that he did not wish to advance more money or participate in any of the proposed future activities of Vandom. At that meeting the limited partners voted to dissolve Vandom. There was no written agreement reflecting the dissolution or evidence indicating that documentation of the dissolution had been filed with the California Secretary of State. Thereafter, Burge instructed the certified public accountant to prepare a final tax return for Vandom because there would be no further activity for the partnership and that there should be a complete writeoff of the investment. The accountant inquired whether there would be future income and Burge advised that there would be no income from the film. The accountant prepared the partnership return reporting a $270,000 loss.

The balance sheet (Schedule L) attached to Vandom's 1981 partnership return reflected the following amounts as of January 1, 1981:

*Assets*

| | |
|---|---:|
| Accounts receivable | $24,392.20 |
| Production costs | 245,607.80 |
| Deferred distribution costs and expenses | 3,560.00 |
| Total assets | 273,560.00 |

---

[2]As of September 1983, Burge had spent an additional $100,000 to make the X-rated version of the film and $70,000 in legal fees in the effort to regain the negative from Bardo.

*Liabilities and Capital*

| | |
|---|---:|
| Accounts payable .............................. | $3,560.00 |
| Capital ........................................ | 270,000.00 |
| Total liabilities and capital.................... | 273,560.00 |

No assets, liabilities, or capital were reflected as of December 31, 1981, on Vandom's 1981 Schedule L attached to its partnership return. Per Vandom's certified public accountant, Vandom had no liabilities at the end of the 1981 year. Vandom's 1981 return reflected only $3,560 of accounts payable as of the beginning of the taxable year, with an offsetting asset in the form of a deferred expense. No liabilities were reflected in connection with the limited partners' relationship with Vandom.

Under the terms of the partnership agreement, the general partner was to pay, from profits, the interest on the limited partners' loans. Vandom did not have any "profits" from inception through December 31, 1981. The partnership agreement provided that any interest payments "from profits shall become an account receivable[3] and be repaid from future profits prior to distribution of profits as set forth in Article IX—DISTRIBUTION OF PROFITS." Article IX provided for the distribution of profits as between limited and general partners and for the use of profits to return capital to the limited partners. Under the partnership agreement, the limited partners were not liable to repay any interest payments, and in any event, repayment was conditional upon the existence of profits. Vandom had made at least one payment to petitioner in connection with the limited partners' loans from Crocker National Bank, but the record does not reflect the specific amount of such payment. In the early part of petitioner's repayment of his Crocker National Bank loan, the interest portion approximated $3,000. The "accounts receivable" balance of $24,392 at the beginning of 1981 may have represented payments of interest regarding the limited partners. If it did represent interest payments regarding each limited partner, then

---

[3]The use of the term "accounts receivable" in the partnership agreement appears to be a misnomer because the limited partners were in no way obligated to repay any amounts of interest paid. Instead, the "repayment" was to come from profits prior to any distribution to the limited or general partners. Additionally, to the extent that interest was paid here, it was not paid in accord with the partnership agreement because of the absence of any profits.

$6,000 of interest would have been paid or reimbursed concerning petitioner. Petitioner's initial basis in his partnership interest was $60,000. Petitioner's adjusted basis in his limited partnership interest as of December 31, 1981, was $54,000.

At the end of 1981 petitioner did not expect to receive anything back from the Vandom limited partnership interest. The Vandom partnership agreement, Article XIV(b), provides that the partnership shall pay the value of a limited partner's interest within 3 months after termination of his interest. Petitioner did not receive any amount under Article XIV(b).

The accountant prepared a Schedule K-1 for each of the limited partners' 1981 taxable year. Petitioner's Schedule K-1 reflected a loss of $60,000 and he claimed a $60,014 loss on Schedule E of his 1981 income tax return. Per the accountant, no financial transaction occurred for Vandom after December 31, 1981. On December 31, 1981, a copyright was filed for the movie at the U.S. Copyright Office. After that time, petitioner did not have any business contact with Burge for the purpose of further discussion concerning Vandom. After Vandom ceased operating, Vandom, Inc., acquired possession of the working print and made an X-rated version of the movie entitled "Foxholes" and on April 9, 1982, also filed a lawsuit against Bardo. The lawsuit concerned whether Millionaire had been awarded the sole worldwide distribution rights to three movies, including the one in issue here. On June 3, 1982, Vandom, Inc., transferred by contract the distribution rights to the movie to Citrus Productions, Inc., an apparently unrelated entity. On September 15, 1983, a California State court ordered Millionaire to turn over a negative of the movie, but also permitted Millionaire to retain a duplicate original (negative) for purposes of distribution. Respondent disallowed the entire $60,014 loss claimed by petitioners.

OPINION

Petitioners claimed a $60,000 ordinary loss, in connection with the investment as a limited partner. Although the loss was first shown as a loss reflected on a Schedule K-1, for purposes of this case it is claimed alternatively as a theft or

embezzlement loss, or as a loss due to abandonment.[4] We first consider whether petitioners incurred a "theft or embezzlement" loss.

*Theft or Embezzlement Loss*

Section 165(a) enables a deduction for "any loss sustained during the taxable year and not compensated for by insurance or otherwise." Concerning theft losses, section 165(a) is applicable for the year "in which the taxpayer discovers such loss." Sec. 165(e). If in the year of discovery there is a claim for reimbursement that has a reasonable prospect for recovery, a loss is not considered sustained until the tax year in which it can be ascertained with reasonable certainty. Secs. 1.165-1(d)(3), 1.165-8(a)(2), Income Tax Regs. Petitioners bear the burden of proving a deductible loss, *Clapp v. Commissioner,* 321 F.2d 12, 14 (9th Cir. 1963), and they must establish the extent and amount of the loss, *Hort v. Commissioner,* 313 U.S. 28, 33 (1941).

The law of the jurisdiction where the loss is sustained is applicable to determine whether a theft or embezzlement has occurred. *Bellis v. Commissioner,* 540 F.2d 448, 449 (9th Cir. 1976); *Luman v. Commissioner,* 79 T.C. 846, 860 (1982). Section 484(a) of the California Penal Code (West 1988), in pertinent part, defines "theft" as follows:

> Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property, * * * is guilty of theft. * * *

The taking of property is not theft in the absence of an intent to steal. *People v. Butler,* 65 Cal. 2d 569, 421 P. 2d 703 (1967). The crime of theft includes theft by embezzlement. *People v. Krupnick,* 165 Cal. App. 2d 755, 332 P. 2d 720, 722 (1958).

The facts here show that Bardo, acting through Millionaire, refused to turn the negative over to Burge after he had

---

[4]Petitioner initially claimed his portion of a partnership-level business or operating loss in accord with his Schedule K-1. For purposes of this case petitioner now claims an embezzlement or theft loss (at the partnership level) and/or an abandonment loss (at the individual partner-investor level).

made demand for it. Millionaire, however, was the executive producer, responsible for below-line expenses, and possessed certain distribution rights regarding the movie. Additionally, the pleadings in the lawsuit between Burge and Bardo do not focus solely on ownership, but upon who was entitled to certain of the distribution rights. Finally, the California State court ordered that Bardo turn over a negative to Burge, but that Bardo would be entitled to retain a negative (duplicate original).

Based upon those facts, respondent argues that petitioners have failed to show that a theft and/or an embezzlement occurred under California law. Petitioner counters that this case is similar to *Sammons v. Commissioner,* T.C. Memo. 1986-318, affd. in part and revd. in part on other issues 838 F.2d 330 (9th Cir. 1988). In *Sammons v. Commissioner, supra,* embezzlement under California law was considered in connection with the taxpayer's payment of $12,000 to an individual for a horse which was never delivered to the taxpayer. Petitioner argues that we should draw an inference from the facts of this case that Bardo intended to unlawfully deprive Vandom of its property and that Bardo had converted the property to his own use. Respondent counters that the facts of this case are distinguishable from those in *Sammons.* We agree with respondent. In *Sammons,* the taxpayer's unsuccessful efforts to find and/or successfully sue the embezzler-seller supported the conclusion that the appropriation constituted an embezzlement. In this case, petitioner's partnership had turned the negative over to Millionaire for an agreed purpose and Millionaire had certain distribution rights concerning the movie. Millionaire's refusal was not equivalent to the embezzler's actions in *Sammons* and we so hold.

## Abandonment Loss

Having decided that petitioners did not show that there had been a theft or embezzlement under California law, we next consider whether petitioner abandoned his partnership interest during the 1981 taxable year and, if he did, the amount of his loss and whether it is ordinary or capital.

To be entitled to deduct an abandonment loss under section 165, a taxpayer must show: (1) An intention on the

part of the owner to abandon the asset, and (2) an affirmative act of abandonment. *United States v. S.S. White Dental Manufacturing Co.,* 274 U.S. 398 (1927); *A.J. Industries, Inc. v. United States,* 503 F.2d 660, 670 (9th Cir. 1974); *CRST, Inc. v. Commissioner,* 92 T.C. 1249, 1257 (1989), affd. 909 F.2d 1146 (8th Cir. 1990).

In determining a taxpayer's intent to abandon, the "subjective judgment of the taxpayer * * * as to whether the business assets will in the future have value is entitled to great weight and a court is not justified in substituting its business judgment for a reasonable, well-founded judgment of the taxpayer." *A.J. Industries, Inc. v. United States, supra* at 670. Here, respondent does not dispute the fact that petitioners may have formed an intent to abandon the partnership interest. Respondent places emphasis on the argument that petitioners have failed to show an affirmative act of abandonment during 1981. Petitioners counter that the record does reflect affirmative acts of abandonment. Specifically, petitioner points out that he told Burge at the December 1981 meeting that he would not provide additional money to the partnership and that he would not become involved in the making of an X-rated film. Petitioner also stated to Burge that he would not have anything further to do with the partnership and the movie. Petitioner also refers us to the fact that the limited partners voted to dissolve[5] the partnership at the December 1981 meeting. Thereafter, Burge told the accountant to file the final partnership return for the period ending December 31, 1981.

Little has been written concerning the abandonment of a partnership interest.[6] Tangible property is capable of physical abandonment, but abandonment of a partnership interest (an intangible property interest) should be accompanied by some express manifestation. Considering the passive

[5]The fact that the dissolution did not formally occur (i.e., proper documents filed with the State of California) prior to the end of the 1981 taxable year is not fatal to petitioner's abandonment argument. In addition, for Federal tax purposes dissolution under State law may be helpful in determining whether a partnership has terminated within the meaning of sec. 708(b), but the dissolution is not dispositive because the provisions of sec. 708 must be met. See also sec. 1.706-1(c)(1), Income Tax Regs. Under sec. 708(b) there must be either a cessation of business or sale or exchange of 50 percent or more of the partnership's capital and profit interests. We further note that it is unclear from the facts in this record whether Vandom had terminated within the meaning of sec. 708(b) as of Dec. 31, 1981.

[6]The parties here did not focus upon the question of whether there had been an abandonment at the partnership level.

nature of a limited partnership interest, the need to manifestly express the intent to abandon is especially important. See, e.g., *Dycus v. Belco Industries, Inc.* 569 P. 2d 553, 555 (Okla. Ct. App. 1977). California has adopted the Uniform Limited Partnership Act, and Cal. Corp. Code sec. 15518 (West 1977) defines a limited partnership interest as "personal property." We could find no reason to treat this personal property[7] differently from other types of personal property. In *Echols v. Commissioner*, 935 F.2d 703 (5th Cir. 1991), revg. 93 T.C. 553 (1989), the Circuit Court held that a partner could and did abandon his partnership interest for Federal tax purposes. In so holding, it was pointed out that neither Texas State law nor the Internal Revenue Code nor underlying regulations specified physical methods or legal procedures for abandoning an interest in a partnership. Accordingly, we proceed to decide whether petitioner abandoned his limited partnership interest during 1981.

An affirmative act to abandon must be ascertained from all the facts and surrounding circumstances, *United California Bank v. Commissioner*, 41 T.C. 437, 451 (1964), affd. per curiam 340 F.2d 320 (9th Cir. 1965), and "the Tax Court [is] entitled to look beyond the taxpayer's formal characterization." *Laport v. Commissioner*, 671 F.2d 1028, 1032 (7th Cir. 1982), affg. a Memorandum Opinion of this Court. "The mere intention alone to abandon is not, nor is non-use alone, sufficient to accomplish abandonment." *Beus v. Commissioner*, 261 F.2d 176, 180 (9th Cir. 1958), affg. 28 T.C. 1133 (1957).

Respondent relies on two cases in support of his argument that petitioners have failed to show an affirmative act of abandonment during 1981. In *A.J. Industries, Inc. v. United States*, 503 F.2d at 674, the U.S. Court of Appeals for the Ninth Circuit held that an "option to salvage, which might never have been exercised" was insufficient to reflect

---

[7] It is noted that limited partnership interests, for purposes of the securities regulation under the Securities Exchange Act of 1934, sec. 10(b), are considered to be within the definition of the term "securities." See *Van Arsdale v. Claxton*, 391 F. Supp. 538, 540 (S.D. Cal. 1975). For purposes of Federal taxation, however, a limited partnership interest is usually dealt with under subchapter K and is not treated as a "security." Specifically, sec. 165(g)(2) defines "security" as something other than a partnership interest, limited or general. Securities are generally defined as shares of stock in a corporation or evidence of indebtedness. See also sec. 1236(c).

an affirmative act of abandonment. Instead, that court held that the abandonment occurred in the next year when the option was exercised. In this case, however, petitioner, as a limited partner, told Burge, who was president of Vandom's general partner, that he would not come up with additional funds and would have nothing further to do with the partnership and movie. Thereafter, petitioner, along with the other three limited partners, agreed to dissolve the partnership. After that point in 1981, Burge pursued the X-rated movie through another entity and pursued legal action against Bardo and his company. Petitioner did not have any further dealings with, had no expectations to receive anything, and received nothing from Vandom or Burge after December 1981.

Respondent also relied upon *Echols v. Commissioner,* 93 T.C. 553 (1989), but that case was reversed by the Court of Appeals for the Fifth Circuit on July 15, 1991, after completion of the briefing in this case. In that case the taxpayer was a 37.5-percent partner in a partnership which had (as its sole asset) undeveloped real property purchased in anticipation of an adjacent highway project. After the highway project stalled due to local opposition and the real estate market went into a slump, another 37.5-percent partner transferred his interest to the taxpayer in exchange for the taxpayer's assumption of the recourse debt outstanding on the realty. The remainder of the debt was nonrecourse. The taxpayer and the remaining 25-percent partner attempted to and finally sold a 50-percent interest in the realty to a third party who defaulted on his payment after a little more than 1 year. Thereafter, the taxpayer met with the 25-percent partner and informed him that he would no longer make payment of his 75-percent portion of the mortgage and taxes. The taxpayer also offered to convey his interest to anyone who would assume his portion of the partnership debt. At that time, the value of the realty had declined to less than the mortgage balance. The taxpayer did nothing more during that year and claimed a capital loss. The next year the mortgagees foreclosed on the realty. Under those facts, we held that there was a failure to manifest abandonment through some act apparent to those outside the partnership, as distinguished from the case of

*Middleton v. Commissioner*, 77 T.C. 310, 322 (1981), affd. per curiam 693 F.2d 124 (11th Cir. 1982). See *Echols v. Commissioner*, 93 T.C. at 555-558. The Court of Appeals for the Fifth Circuit, however, held that abandonment should not be viewed solely from a partnership perspective and that the taxpayer's actions were sufficient to constitute an abandonment of his partnership interest during 1976. *Echols v. Commissioner*, 935 F.2d at 709. There is no requirement that a taxpayer relinquish title in order to establish a loss if such "loss is reasonably certain in fact and ascertainable in amount." *Middleton v. Commissioner*, 77 T.C. at 322.

In this case, the partners borrowed the money necessary to produce the movie, and they were personally obligated to pay the debt even if no movie or asset was ever in existence. In other words, there were no interested parties, such as mortgagees, to whom to manifest the abandonment. The limited partners here voted to dissolve and abandon the interest or rights that they may have had in the negative. They were not interested in participating in the conversion of the working print into an X-rated movie, and petitioner communicated to the general partner that he no longer had any interest in the partnership or the movie. Based upon those events and that communication, Burge proceeded (without the financial assistance or involvement of petitioner) to make an X-rated movie and to pursue through legal action the negative held by Bardo and his company. We find the facts of this case to be distinguishable from those in the cases cited by respondent.[8] Here, petitioner manifested his intent to abandon by an overt act of abandonment to the parties in interest (the general partner

---

[8]Respondent also argued that petitioner did not abandon because the words "Vandom Productions" continued to appear (without any activity) on a schedule attached to petitioner's income tax returns for 2 years after the claimed abandonment. Petitioner proved by means of the uncontroverted testimony of his certified public accountant, who prepared all returns in evidence, that the words "Vandom Productions" appeared solely because the accountant had not modified the computer data. Once Vandom Productions had been put on that schedule, the program was designed to automatically print that name on the schedule until it was specifically removed. No activity was shown after the $60,000 loss (representing petitioner's entire investment) was claimed for 1981; merely the name "Vandom Productions" was shown. The accountant removed the name from the schedule after the 1983 taxable year. It is also noted that other partnership names (in addition to Vandom Productions) in which petitioner no longer had an interest, also appeared in the 1982 and 1983 returns. We have not found, as respondent has argued, that these mechanical occurrences show continued ownership or a lack of intent to abandon.

and all limited partners). Burge proceeded to close down the partnership (directing that a final partnership return be filed) and to treat the movie and the rights to it as no longer belonging to the limited partners, including petitioner.

Having found that petitioner abandoned his interest in the partnership as of the end of 1981, we must now decide whether the loss is capital or ordinary. If petitioner's loss is from the sale or exchange of a capital asset, the amount of capital loss allowable for the taxable year is the lower of $3,000 or the excess of capital losses over capital gains. Secs. 165(f), 1211, and 1212(b). If, on the other hand, the loss is ordinary, the limitation of section 1212(b) would not be applicable.

Although partnership interests are property and should be subject to the abandonment principles in the same manner as any other property, some distinctions have been made and commentary[9] expressed concerning whether the abandonment of a partnership interest should or could result in an ordinary loss. Because subchapter K generally provides for sales, exchanges, and other dispositions of partnerships and partnership interests, it has been suggested that some potential for overlap may exist between subchapter K and section 165.

This Court, in the context of the Internal Revenue Code of 1939, has decided that abandonment (forfeiture) of a partnership interest was not a sale or exchange and could be accorded ordinary (rather than capital) loss treatment. *Gannon v. Commissioner,* 16 T.C. 1134, 1139 (1951); *Hutcheson v. Commissioner,* 17 T.C. 14 (1951). No changes were made in the loss provisions of the Internal Revenue Code of 1954 which would dictate a change in the case precedent under the 1939 Code. There is limited precedent, in other courts, under the Internal Revenue Code of 1954, that the worthlessness of a partnership interest (a capital asset) may result in an ordinary loss. *Zeeman v. United States,* 275 F. Supp. 235, 253 (S.D.N.Y. 1967), affd. and remanded on other issues 395 F.2d 861 (2d Cir. 1968).

---

[9]See, for example, 2 W. McKee, W. Nelson, and R. Whitmore, Federal Taxation of Partnerships and Partners, par. 15.06, at 15-46 (2d ed. 1990); 3 A. Willis, J. Pennell, and P. Postlewaite, Partnership Taxation, sec. 121.04, at 121-15 (4th ed. 1989); Moyer, "Abandoning Partnership Interests: Ordinary Versus Capital Loss," 61 Neb. L. Rev. 621 (1982).

We have addressed several post-Internal Revenue Code of 1954 cases where taxpayers were found to have capital losses because they were relieved of liabilities by means of their abandonment resulting in a sale or exchange. See, for example, *Middleton v. Commissioner*, 77 T.C. 310, 319-324 (1981), affd. per curiam 693 F.2d 124 (11th Cir. 1982); *Freeland v. Commissioner*, 74 T.C. 970, 982-983 (1980). More specifically, in a partnership setting we held that a decrease in a taxpayer's individual liabilities by reason of the assumption of debt by the partnership can constitute a deemed distribution under section 752(b).[10] *O'Brien v. Commissioner*, 77 T.C. 113, 118-120 (1981). In that case it was reasoned that distributions deemed as such were sales or exchanges of a partnership interest within the meaning of section 731(a), resulting in capital gain or loss pursuant to section 741.

Respondent argues in this case that if we find that petitioner abandoned his partnership interest during 1981, such abandonment resulted in a sale or exchange within the meaning of section 741 because the partnership had a $3,560 liability at the end of its taxable year.

Petitioner counters that respondent is in error concerning the $3,560 liability. Petitioner points out that the $3,560 liability only appears as an opening balance on the balance sheet on Vandom's final return (Form 1065 for the 1981 year) and that no liabilities are reflected for the partnership as of the close of the 1981 year. The certified public accountant for Vandom testified and confirmed that there were no liabilities in reference to the limited partners. Because respondent has incorrectly interpreted the facts, his argument on this point must fail because there was no debt to be assumed by the partnership. It is also noted that the partnership return at the beginning of the 1981 year reflected deferred distribution costs and expenses in the amount of $3,560 as an asset. It would not be unreasonable to assume that the deferred expenses had been carried over from 1980 yearend operations, and that the deferral was reversed and the liability paid early in the 1981 year.

---

[10]Sec. 752(b) provides that "Any decrease in a partner's share of the liabilities of a partnership, or any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership."

Respondent also argues that the abandonment would be a sale or exchange because petitioner may have received the benefit of an interest payment, during 1981, regarding his loan with Crocker National Bank. Although the record is not clear whether any such payments were made on petitioner's behalf during 1981, these payments, if made, were not made in liquidation of or exchange for petitioner's interest in Vandom or at the time of abandonment.

It is clear, however, that petitioner was not directly or constructively paid any amount for his partnership interest in Vandom as of the end of the 1981 taxable year. Accordingly, we must decide whether abandonment of a partnership interest (where there are no liabilities owed by the partnership) would result in ordinary loss under post-1939 versions of the Internal Revenue Code.[11]

We have not, under the 1954 or later versions of the Internal Revenue Code, decided whether abandonment of assets (including partnership interests), where no partnership liabilities exist, results in ordinary, rather than capital, loss. See *Stilwell v. Commissioner*, 46 T.C. 247, 252 n.3 (1966). It is noted that *Stilwell* involved a liquidation of a two-man partnership where we found no terminology had been used to indicate that a sale or exchange had occurred.

The effect of liabilities was touched upon in *La Rue v. Commissioner*, 90 T.C. 465, 482-483 (1988), where we stated:

Losses allowed by section 165 may be either ordinary or capital in character. Section 1222 defines a capital loss as a loss from the sale or exchange of a capital asset. A partnership interest is a capital asset under section 741. We must determine whether an actual or constructive sale or exchange occurred here.

The touchstone for sale or exchange treatment is consideration. If, in return for assets, any consideration is received, even if nominal in amount, the transaction will be classified as a sale or exchange. * * *

Respondent's argument here follows the above-quoted principle, but then goes further by reference to Rev. Rul. 76-189, 1976-1 C.B. 181. That ruling expresses the view that

---

[11]Although we decide that abandonment of a partnership interest may result in ordinary, rather than capital, losses, the requirement that there be no partnership liabilities is likely to limit the pervasiveness of this holding. Additionally, it would not be a usual occurrence for a business or investor to abandon a valuable asset which has no debt associated with it. Moreover, satisfaction of the debt prior to abandonment may be too high a "price" to "pay" for the tax savings attributable to avoiding the current $3,000 capital loss limitation.

even where a partnership has no assets or liabilities at termination, any loss of a partner is subject to section 731 and results in capital loss.[12] There are no cases which support this view and we treat respondent's rulings merely as the position of a party. *Estate of Lang v. Commissioner,* 613 F.2d 770 (9th Cir. 1980), affg. in part, revg. in part 64 T.C. 404 (1975) (Court reviewed). Section 731 is specifically concerned with "Recognition of Gain or Loss on *Distribution.*" (Emphasis supplied.) Because section 731 concerns distributions and literally requires a distribution to be operative, respondent, in the ruling, treats the transaction as though an actual distribution had taken place.[13]

No rationale or support[14] is provided in the ruling for the supposition deeming the existence of a distribution for purposes of section 731. In order to decide this case under the theory used by respondent in the ruling, we would be compelled to impute a sale or exchange, even though none had occurred. This we decline to do. Section 165 losses are not limited to certain types of assets, and sections 701 through 761 are not literally exclusive for purposes of abandonment. Section 752(b), for example, may come into play in situations where abandonment results in a decrease in a partner's liabilities. That section deems such an event to constitute a "distribution of money to the partner." In that event, the case precedent, sections 731 and 741, and

---

[12]In an earlier ruling, respondent advised that a limited partner could deduct, as an ordinary loss under sec. 165, his partnership interest upon the bankruptcy of the partnership. Rev. Rul. 70-355, 1970-2 C.B. 51.

[13]Respondent has chosen to ignore the distribution requirement of sec. 731. We note that respondent did not choose to ignore the "sale or exchange requirement" to reach the same result. Possibly respondent was cognizant of his long-standing regulations containing a clear distinction between sales and exchanges and abandonments where taxpayers receive no benefit in connection with the abandonment. See sec. 1.167(a)-8(a), Income Tax Regs. Our holdings in cases such as *Freeland v. Commissioner,* 74 T.C. 970 (1980), and *Middleton v. Commissioner,* 77 T.C. 310 (1981), affd. per curiam 693 F.2d 124 (11th Cir. 1982), that relief from nonrecourse indebtedness was received in "exchange" for the abandonment, do not diminish the fundamental distinction made in the regulations between sales and exchanges and abandonments. *Lockwood v. Commissioner,* 94 T.C. 252, 260 (1990).

[14]It may be that respondent is attempting to take partnership interests out of the realm of sec. 165 and to have them exclusively and consistently treated under subchapter K. Although some may agree that would be a good or appropriate policy consideration (see 4 A. Willis, J. Pennell, and P. Postlewaite, Partnership Taxation, sec. 121.04, at 121-15 (4th ed. 1989)), it is not our role to make the proper or appropriate policy considerations in the promulgation or enforcement of the laws. It also seems paradoxical that two taxpayers with substantially similar situations would be treated differently because of $1 or more of unpaid liabilities existing upon abandonment. On the other hand, one may also argue that it is good policy to treat taxpayers who abandon assets the same, irrespective of the type of asset, so long as sec. 165 requirements are met.

other considerations may result in capital gain or loss due to abandonment of a partnership interest.

Accordingly, petitioners are entitled to ordinary loss treatment with respect to the abandonment of the Vandom partnership interest during 1981.

*Basis of Partnership Interest—Amount of Loss*

Next, we consider whether petitioner's basis in his limited partnership interest was $60,000 or some lesser amount attributable to distributions from Vandom. The evidence in the record on this point is somewhat contradictory and unclear. On one hand, the partnership was to pay petitioner's interest payments out of "profits" and an accounts receivable established for any such payments. Vandom had no profits and it is not clear that the accounts receivable[15] on the books at the beginning of 1981 were for this purpose. On the other hand, evidence was offered indicating that on one occasion a check had been provided to petitioner to cover an interest payment on his $60,000 loan from Crocker National Bank. The document is undated and does not specify any dates or the frequency of such activity. Petitioner testified that he did not recall receiving any distributions from Vandom and respondent argues, but did not prove, that Burge told respondent's agent that interest had been paid on the limited partners' loans.

Petitioner bears the burden of showing his adjusted basis for purposes of establishing the amount of his loss from abandonment of the limited partnership interest. *Welch v. Helvering,* 290 U.S. 111 (1933); Rule 142(a). In the face of evidence reflecting that some payment had been made to petitioner concerning interest and the possibility that a portion of the accounts receivable on Vandom's books represented such payments, petitioner should have offered evidence to show that no such payments or distribution were made. Such evidence would have been available in the form of Vandom's records, and we presume that such

---

[15]We do not use the term "accounts receivable" here to denote that there was any debt or obligation on the part of petitioner for repayment. That term is unartfully used in the partnership agreement because the interest was only payable out of profits and there was no debt or obligation in existence at the time of the abandonment. Our reference here is for the purpose of deciding the amount of the interest paid on petitioner's loan during 1980, to determine his adjusted partnership basis.

evidence would be unfavorable to petitioner if adduced. *Wichita Terminal Elevator Co. v. Commissioner,* 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

The earlier quarterly interest payments due on petitioner's loan from Crocker National Bank approximated $3,000. Vandom's accounts receivable at the beginning of 1981 approximated $24,000.[16] With four limited partners, it is reasonable to expect that one-fourth of the receivable would have been attributable to petitioner. We accordingly find that petitioner, early in his relationship with Vandom, received two quarterly interest amounts totaling $6,000. Although petitioner was not liable to repay the interest because it was eventually to be taken out of Vandom's profits, these amounts are distributions within the meaning of subchapter K, but they were not likely made during 1981. These distributions would cause a reduction of petitioner's basis and result in an adjusted basis of $54,000. Secs. 705(a), 733. In view of the foregoing, we hold that petitioners are entitled, in their 1981 taxable year, to deduct a $54,000 ordinary loss from abandonment of their Vandom limited partnership interest.

Petitioners had also raised an issue concerning whether they should have recaptured a $6,000 investment tax credit. Petitioners conceded that issue on brief if we should find that they are entitled to an ordinary loss. Additionally, it is not necessary to consider the addition to tax under section 6653(a). The sole adjustment giving rise to the deficiency in this case was the disallowance of petitioners' claimed ordinary loss. Due to our holding on that issue and the absence of any significant amount of deficiency or underpayment which could be attributable to "negligence," we find that petitioners are not liable for the addition to tax under section 6653(a).

---

[16]It is likely that the ending accounts receivable were the same as the beginning because the accountant arrived at a total loss of $270,000, representing partners' capital. The 1981 beginning balance sheet reflected the $24,392.20 accounts receivable and $245,607.80 production costs, which total $270,000. This may also indicate that the payments regarding the interest, if any, were made before the beginning of 1981. The accounts receivable were to be paid out of profits, and petitioner and the other limited partners were not liable for repayment of the interest.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

CHABOT, KÖRNER, SHIELDS, WRIGHT, PARR, WELLS, RUWE, COLVIN, HALPERN, and BEGHE, *JJ.,* agree with the majority opinion.

NIMS, *C.J.,* concurs in the result only.

HAMBLEN, *J.,* did not participate in the consideration of this opinion.

---

SWIFT, *J.,* dissenting. For the reasons set forth below, I respectfully disagree with the allowance by the majority opinion in this case of an abandonment loss.

As the findings of fact of the majority opinion explain (majority op. pp. 205-206), even though Vandom had no profits (and therefore contrary to the partnership agreement), Vandom made payments of interest on behalf of petitioner with regard to the loan petitioner obtained from the bank. Because the payments by the partnership of interest petitioner owed to the bank were contrary to the partnership agreement, the provision of the partnership agreement making petitioner not liable to reimburse the partnership for interest paid out of partnership profits would appear to be inapplicable. Vandom accounted for these payments of interest on behalf of petitioner as accounts receivable (i.e., as loans made to petitioner by Vandom and as debts owed by petitioner to Vandom).

When petitioner allegedly abandoned his interest in Vandom, petitioner apparently walked away from these debts he owed to Vandom (in the total principal amount of at least $6,000). Petitioner's relief from, or the extinguishment of, the debts petitioner owed to Vandom appears to constitute consideration and should, in my opinion, cause the transaction in issue to be treated either as a sale or exchange, or as a distribution. See *La Rue v. Commissioner,* 90 T.C. 465, 482-483 (1988); *Middleton v. Commissioner,* 77 T.C. 310, 319-324 (1981), affd. per curiam 693 F.2d 124 (11th Cir. 1982); *O'Brien v. Commissioner,* 77 T.C. 113,

118-120 (1981); *Freeland v. Commissioner*, 74 T.C. 970, 980-983 (1980).

Further, as the majority opinion explains, the authorities are somewhat unsettled concerning the legal question of whether a partner can ever abandon an interest in a partnership *and* obtain with regard thereto a section 165 ordinary loss deduction. Note that in *Echols v. Commissioner*, 935 F.2d 703 (5th Cir. 1991), revg. *Echols v. Commissioner*, 93 T.C. 553 (1989), a capital, not an ordinary, loss was allowed with respect to the abandonment of a partnership interest. Apart from that unsettled legal question, however, the authorities are quite clear and consistent that before an abandonment loss of any kind can be allowed the taxpayer has a heavy burden of proof to establish that a true abandonment of the property occurred, which abandonment must be evidenced by affirmative acts. See, e.g., *Echols v. Commissioner*, 93 T.C. 553, 557 (1989), revd. 935 F.2d 703, 706 (5th Cir. 1991), in which we stated—

for an abandonment to be effective for purposes of section 165(a), the abandoning party must manifest an intent to abandon by some overt act or statement reasonably calculated to give a third party notice of the abandonment. * * *

Particularly with regard to intangible, passive property such as an ownership interest in a partnership, "the need to manifestly express the intent to abandon is especially important." Majority op. pp. 209-210.

Even while reversing our opinion in *Echols v. Commissioner, supra*—with the explanation that, in its opinion, we focused too much on the actions of the partnership, rather than on the actions of the partner-taxpayer claiming the abandonment loss—the Fifth Circuit in *Echols v. Commissioner, supra*, noted that the taxpayers therein made a—

clear and unequivocal indication to * * * [the other partners] and the world that * * * [they] were "walking" from their ownership interest in the Partnership. And they kept that vow, never thereafter to return to acts of ownership toward or contributions to the Partnership. [*Echols v. Commissioner*, 935 F.2d at 706.]

As an additional element of the taxpayer's burden of proof, the taxpayer must also establish that the underlying transaction or events (on which the alleged abandonment

loss is based) did not, in fact, represent or involve a distribution, a dissolution and liquidation, or a sale or exchange. *Boehm v. Commissioner,* 326 U.S. 287 (1945); *Commissioner v. Houston,* 283 U.S. 223 (1931); *La Rue v. Commissioner, supra; Middleton v. Commissioner, supra; O'Brien v. Commissioner, supra; Freeland v. Commissioner, supra; Pallan v. Commissioner,* T.C. Memo. 1986-76.

In regard specifically to petitioner's burden of proof in this case, a review of the record herein indicates that petitioner (contrary to his alleged 1981 abandonment) claimed a continuing ownership interest in Vandom not only on his 1981, but also on his 1982 and his 1983 Federal income tax returns, each of which was prepared by an accountant. Also, the findings of fact set forth in the majority opinion do not adequately establish express affirmative acts of abandonment by petitioner with regard to his interest in Vandom.

I respectfully suggest that the abandonment loss claimed in this case should be disallowed on the ground either that in conjunction with the termination of petitioner's interest in Vandom a sale or exchange, or a distribution to petitioner, occurred, or on the ground that petitioner has failed to satisfy his burden of proving that he abandoned his partnership interest in Vandom in 1981.

PARKER, COHEN, JACOBS, and WHALEN, *JJ.,* agree with this dissent.