T.C. Summary Opinion 2003-50

UNITED STATES TAX COURT

JEROME J. KLAWITTER AND ANN T. KLAWITTER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 7491-01S.                    Filed May 12, 2003.

<u>John W. Johnson</u> and <u>Brian A. Mills</u>, for petitioners.

<u>W. Lance Stodghill</u>, for respondent.

CARLUZZO, <u>Special Trial Judge</u>:  This case was heard pursuant
to the provisions of section 7463 of the Internal Revenue Code in
effect at the time the petition was filed.  Unless otherwise
indicated, subsequent section references are to the Internal
Revenue Code in effect for 1993, 1995, 1996, or 1997, as
appropriate.  The decision to be entered is not reviewable by any
other court, and this opinion should not be cited as authority.

Respondent determined deficiencies in petitioners' 1995, 1996, and 1997 Federal income taxes in the respective amounts of $3,229, $4,414, and $8,721. The issue for decision for each year is whether petitioners are entitled to a deduction for a net operating loss carryover. The resolution of the issue depends upon whether petitioners sustained a deductible loss in 1993 when Jerome J. Klawitter (petitioner) surrendered his interest in a certain partnership.

Background

Some of the facts have been stipulated and are so found. Petitioners are husband and wife. They filed a timely joint Federal income tax return for each year in issue. At the time the petition was filed, petitioners resided in Austin, Texas.

Petitioner holds a Ph.D. in engineering. Before the years in issue he was a member of the faculty of several universities. His doctoral dissertation, submitted in 1970, involved the development of porous structures in ceramic materials to enable biological attachment between the human skeletal system and an orthopedic implant such as an artificial hip or knee. He taught bioengineering at Clemson University until 1975, when he began teaching courses in biomaterials and biomechanics at Tulane University.

While on the faculty of Tulane, petitioner designed an artificial heart valve constructed from carbon-based materials. In 1978, petitioner's work brought him into contact with Dr. Russ Chambers (Dr. Chambers). Shortly after they met, petitioner and Dr. Chambers organized Hemex, Inc. (Hemex), for the purpose of producing artificial heart valves. In 1980, petitioner resigned from Tulane to become president of Hemex. Dr. Chambers was chairman of the board. Hemex developed an all-carbon heart valve replacement that was approved by the Food and Drug Administration. On December 16, 1986, the assets of Hemex were acquired by Baxter Healthcare Corp. (Baxter), a company involved in the production and marketing of artificial heart valves.

On December 27, 1986, petitioner and Tellurogenic, an entity created and controlled by Dr. Chambers, formed and became general partners in Archimedes Partnership (Archimedes). Initially, Tellurogenic served as managing general partner of Archimedes. The original capital structure of Archimedes consisted of petitioner's contribution of $3.065 million in cash and Tellurogenic's contribution of 75,000 shares of Dews Laboratories, Inc.[1] According to Archimedes's amended articles

---

[1] The value of this stock at the time of its contribution cannot be determined from the record.

of partnership, after the return of capital, liquidation rights of the partners were equal.  Periodic distributions of income were to be made, if at all, in a ratio of 75 percent to 25 percent in favor of petitioner.  Losses were allocated in proportion to each partner's capital account, except that in 1987, the first $75,000 of losses was allocated to Tellurogenic.

On January 23, 1987, approximately 1 month after Archimedes was formed, the Onex Farms Partnership (Onex Farms) was formed, apparently as proposed by Dr. Chambers.  Onex Farms originally consisted of three general partners:  (1) Lever, Inc. (Lever), a corporation organized, controlled, and owned entirely by petitioner;[2] (2) Pencot Farm Management, Inc.[3] (Pencot), an entity organized and controlled by Dr. Chambers; and (3) Archimedes.  Onex Farms purchased and held title to a large peanut and cotton farm in Georgia (the Georgia farm), which was operated pursuant to an arrangement with a local farmer.  Profits and losses from farming operations were divided equally between Onex Farms and the farmer.

---

[2] Although it was named as a partner in Onex Farms in the Jan. 23, 1987, agreement, Lever was not actually incorporated until Feb. 4, 1987.

[3] "Pencot" is spelled as such on some documents in the record but spelled "Pentcot" or "Pentecot" in others.

Initial capital contributions to Onex Farms were made as follows:

| Partner | Capital Contribution |
|---------|---------------------|
| Lever | $500,000 |
| Pencot | $1,000,000 ($400,000 in cash and the balance in a note, or notes, payable to the partnership) |
| Archimedes | $1,000,000 |

Profits and losses from Onex Farms, as well as the partners' ownership interests, were divided in proportion to the partners' capital contributions; namely, 40 percent each for Pencot and Archimedes and 20 percent for Lever.

On December 3, 1990, the Archimedes partnership agreement was amended. The amended agreement was retroactive, taking effect on January 1, 1990. The name of the partnership was changed to Archimedes Limited Partnership, and two new partners were added: Le Damier Trust (Le Damier) as a limited partner and Edwin Hunter (Mr. Hunter) as an "ordinary" partner.[4] Le Damier made a capital contribution of 982,358 units in

---

[4] Edwin Hunter was Dr. Chambers's attorney. He appears to have represented many of the entities and individuals involved in the various transactions and business organizations discussed in this case. We assume that the reference to "ordinary" partner means general partner. Le Damier Trust was represented by Shirley Kidd Hunter, Edwin Hunter's mother.

the Hemex Liquidation Trust.[5] Mr. Hunter did not make a capital contribution to the partnership and was not entitled to a distribution upon its liquidation. Pursuant to the amended agreement Tellurogenic was no longer designated the partnership's managing partner, and unanimous consent of the general partners was required for partnership decisions.

In May 1992, petitioner formed Ascension Biomedical, a company through which he intended to develop finger joints made from carbon. Nothing in the record suggests that Dr. Chambers was involved in this company. A short time later, the Archimedes partners decided to terminate Archimedes, effective December 30, 1992. The partners agreed that petitioner would serve as the liquidating partner. Petitioner and Dr. Chambers disagreed over petitioner's proposal to distribute Archimedes's 40-percent interest in Onex Farms to himself. Apparently Dr. Chambers believed that he and petitioner (directly or through various entities that each owned or controlled) were equal partners in Onex Farms, and if petitioner received Archimedes's entire 40-percent interest, then petitioner would own 60 percent (directly and through Lever) of that partnership. Dr. Chambers apparently threatened petitioner with a lawsuit if petitioner distributed the assets of Archimedes as proposed. Nevertheless,

---

[5] Little is known about this entity other than that it was apparently created in connection with Baxter's acquisition of Hemex's assets.

on December 31, 1992, petitioner, acting as Archimedes's liquidating partner, distributed Archimedes's 40-percent interest in Onex Farms (the distributed partnership interest) to himself.

With respect to the distributed partnership interest, in a letter dated April 11, 1993, addressed to Mr. Hunter, petitioner states:

> I have come to the conclusion it is not in my personal or business best interest to pursue claims on Archimedes['s] interest in the Georgia farm property called Onex Farms. A dispute with Russ Chambers would eventually prove interminable, explosive, and most likely what I would recover in the end will not be of any value. Accordingly, I am surrendering Archimedes['s] interest in Onex Farms.

Notwithstanding the date of the letter, the partnership return filed by Onex Farms for 1993, designated the partnership's final return, indicates that petitioner's share of profits, losses, and capital was 40 percent. The Schedule K-1, Partner's Share of Income, Credits, Deductions, etc., issued to petitioner by Onex Farms indicates that petitioner received "withdrawals and distributions" totaling $995,189 during 1993. Approximately, $22,000 was withdrawn or distributed in cash. Onex Farms' 1993 return further reflects that Pencot's and Lever's shares of profits, losses, and capital were 40 percent and 20 percent, respectively.

Onex Farms was terminated on December 3, 1993. On the same date, Titan, L.L.C. (Titan), was formed by Lever and Pencot, each owning 50 percent of the company. As indicated by its articles

of organization, Titan was formed for "the continuation of the business formerly operated as Onex [Farms]." Assets distributed to Lever and Pencot in the liquidation of Onex Farms (including the Georgia farm) were transferred to Titan. Petitioner considered the termination of Onex Farms and creation of Titan to be little more than a name change. The record does not establish how Lever (a 20-percent partner according to the final partnership return of Onex Farms, or a 33-1/3-percent partner taking into account petitioner's surrender of the distributed partnership interest) acquired a 50-percent partnership interest in Titan.

At the time Titan was formed, petitioner intended to liquidate Lever. Titan's operating agreement states as follows:

> Members contemplate that Lever, Inc. may liquidate. Should it liquidate, notwithstanding the restrictions against transfer of an interest, the Company will continue and there shall be a single transfer of Lever, Inc.'s interest to its current shareholder of record, Jerome J. Klawitter, Ph.D. The transfer must be made within one year of the date of this agreement.

Lever was liquidated on July 5, 1994, and, as planned, petitioner acquired Lever's ownership interest in Titan. As of the close of 1994, petitioner owned 50 percent of Titan. The other 50 percent was owned directly or indirectly by Dr. Chambers.

Little is known about petitioners' 1993 Federal income tax return since it has not been made part of the record.

Nevertheless, on that return petitioners apparently claimed an ordinary loss deduction of $708,689, attributable to petitioner's surrender of the distributed partnership interest. This ordinary loss deduction apparently gave rise to a net operating loss that resulted in the net operating loss carryover deductions here in dispute.

In the notice of deficiency, respondent disallowed the net operating loss carryover deduction claimed for each year in issue because, according to respondent, petitioners failed to establish that a loss was incurred in 1993 "on the abandonment of a partnership interest".

Discussion

An individual who abandons a partnership interest is entitled to a deduction for any loss sustained during the year of that abandonment if, in addition to other requirements, (1) the individual intends to abandon the partnership interest, and (2) the individual's intent to abandon the interest is manifested by some affirmative act of abandonment. Sec. 165(a), (c)(2); Citron v. Commissioner, 97 T.C. 200, 208-209 (1991); Tsakopoulos v. Commissioner, T.C. Memo. 2002-8. Both parties cite Citron in support of their respective positions.[6] According to petitioners, petitioner intended to abandon the distributed

_____

[6] In this case, given the manner in which the issue was framed, we need not address the computation or characterization of the abandonment loss deducted in 1993.

partnership interest in 1993, and his letter dated April 11 of that year to Mr. Hunter expressly manifested his intent to do so. According to respondent, petitioner "had neither the intent to abandon the interest in Onex Farms, nor did * * * [he] affirmatively act to abandon the property by walking away from * * * [his] interest and having nothing more to do with the property". Before addressing the dispute between the parties on these points, we think it is appropriate first to comment on the dispute between petitioner and Dr. Chambers regarding the distribution of assets upon the liquidation of Archimedes.

If we ignore the various entities involved, it is fair to conclude from petitioner's presentation at trial that Dr. Chambers considered himself and petitioner to be equal owners of Onex Farms, which held title to the Georgia farm. Nothing in the record suggests that Dr. Chambers objected to any other aspect of the Archimedes liquidation, or that Onex Farms owned any other property of significant interest to Dr. Chambers. Upon the liquidation of Archimedes, petitioner's ownership interest in Onex Farms, and, more importantly, his right to its assets upon liquidation, increased. This increase meant that petitioner's total interest in Onex Farms (40 percent directly and 20 percent indirectly through Lever) exceeded Dr. Chambers's total interest in Onex Farms. From petitioner's presentation at trial, it is clear that this situation was not acceptable to Dr. Chambers.

As noted, Dr. Chambers believed that through Lever, Pencot, and Archimedes he and petitioner were, in effect, equal owners of Onex Farms. Apparently, Dr. Chambers would not accept the consequences of any transaction that resulted in the diminution of his ownership interest in Onex Farms.

Petitioner explained that he surrendered the distributed partnership interest because he did not want to be sued by Dr. Chambers, whom he describes as an aggressive, overbearing individual. Petitioner did not explain why he did not simply divide that interest in a manner satisfactory to Dr. Chambers and preserve their equal ownership in Onex Farms. Instead, petitioner, acting as liquidating partner of Archimedes, caused the distributed partnership interest to be distributed in its entirety to himself. When petitioner ultimately surrendered the distributed partnership interest, we would expect it to have been allocated proportionally among the remaining partners, resulting in Lever's and Pencot's owning 33-1/3 percent and 66-2/3 percent,[7] respectively, of Onex Farms, but this expected result is reflected neither in the final partnership return of Onex Farms nor in the ownership interests in Titan. When Onex Farms was terminated and Titan created for "the continuation of the

---

[7] Arguments in petitioners' memorandum are based upon the premise that after petitioner surrendered the distributed partnership interest, Lever owned a one-third partnership interest in Onex Farms and Pencot owned a two-thirds interest. There is no support for this premise in the record.

business formerly operated as Onex [Farms]", without explanation and contrary to petitioner's description of the event as little more than a name change, Lever owned 50 percent, rather than 33-1/3 percent, of Titan.  We can only assume that this occurred because, consistent with Dr. Chambers's consternation over the distribution of Archimedes's assets, petitioner and Dr. Chambers agreed that, however the deal was structured, each should have, directly or indirectly, an equal share in the Georgia farm owned first by Onex Farms and subsequently by Titan.

Petitioner's conduct, in surrendering the distributed partnership interest while planning and engaging in a series of transactions that ultimately led to the Georgia farm's being held by an entity owned equally by himself and Dr. Chambers, provides strong support for the conclusion that petitioner and Dr. Chambers in fact had an agreement or understanding, express or implied, that they would be equal owners of the Georgia farm, regardless of its formal ownership structure at the entity level.

Set against this background, we think it is unnecessary to apply the principles used to determine a taxpayer's entitlement to a deduction for an abandonment loss as articulated in Citron v. Commissioner, supra, and similar cases, because we find that, for Federal income tax purposes, petitioner did not actually abandon the distributed partnership interest as he claims.  See Tsakopoulos v. Commissioner, supra (citing Richardson v. McNulty,

24 Cal. 339, 345 (1864) ("[One who abandons property] must leave it free to the occupation of the next comer, whoever he may be, without any intention to repossess or reclaim it for himself in any event, and regardless and indifferent as to what may become of it in the future.")). Instead, through a series of transactions, including the liquidation of Lever, petitioner effectively retained the partnership interest that he claimed to have abandoned. See Commissioner v. Clark, 489 U.S. 726, 738 (1989) ("interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction"); Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945). Consequently, petitioners are not entitled to a loss deduction in 1993 based upon petitioner's surrender of the distributed partnership interest. It follows that petitioners are not entitled to the net operating loss carryover deductions here in dispute, and we so hold.

Reviewed and adopted as the report of the Small Tax Case Division.

To reflect the foregoing,

Decision will be

entered for respondent.