George E. Thurner, et al. [1] v. Commissioner. Thurner v. Commissioner
Docket Nos. 25862, 27402.[1]
United States Tax Court
1952 Tax Ct. Memo LEXIS 350; 11 T.C.M. (CCH) 42; T.C.M. (RIA) 52009; January 21, 1952
*350 1. Held, the wives of the petitioners were bona fide partners in two business partnerships in the years in question. 2. Held, the expense of repair work to the roof and brick of a building was deductible as business expense in determining partnership net income. 3. Held, capital expenditures made by a lessee to improve rented property were depreciable over the life of the improvements rather than the unexpired term of the lease when the lessee continues to occupy the property indefinitely. 4. Held, the fair market value of a gas station, received by a creditor as payment in full of the debt, determined for use as the basis of the property for determining gain or loss on subsequent sale. 5. Held, that properties were held primarily for sale to customers in the ordinary course of trade or business. George W. Weber, Jr., Esq., Arthur R. Heckerman, Esq., and Joseph H. Hoodin, Esq., 505 Walnut St., Cincinnati, Ohio, for the petitioners. Hugh F. Culverhouse, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined deficiencies in income taxes as follows: Docket
Name
No.
Year
Amount
George E. Thurner
25862
1944
$37,982.62
1945
27,746.30
27402
1946
37,265.00
1947
58,546.62
John L. Scheper
25814
1944
8,246.58
1945
8,611.34
27419
1946
14,822.10
1947
30,851.68
Norman P. Ries
25840
1944
12,242.23
1945
15,887.04
27467
1946
23,877.98
1947
37,062.00
*351 The proceedings were consolidated by order of the Court. One issue raised by the pleadings is not contested. The issues presented for determination are: 1. Whether each of the three petitioners is taxable upon the distributive shares of partnership income of the Acme Sash and Door Company for the years 1944, 1945, 1946 and 1947 which were attributable to their respective wives. 2. Whether each of the three petitioners is taxable upon the distributive shares of partnership income of the Allen A. Smith Company for the years 1944, 1945 and 1946 which were attributed to their respective wives. 3. Whether the expenses incurred in having work done to the brick and roof of a building occupied by a partnership constituted a capital expense or an ordinary business expense. 4. Whether certain improvements to a building leased by a partnership should be depreciated over a period equal to the life of the improvements or over the unexpired portion of the lease. 5. Whether petitioner, George E. Thurner, sustained a loss on the sale of certain real property, and the amount of the loss. 6. Whether petitioner, George E. Thurner, held certain real estate property primarily for sale to customers in the *352 ordinary course of business. Findings of Fact I. Facts relative to the issues concerning the taxable share of partnership income attributed to the petitioners' wives. The petitioner, George E. Thurner, and his wife, Edna Mae Thurner, were married in 1919. George Thurner was then employed as a clerk by a bank in Cincinnati, Ohio. Petitioner Thurner and his wife bought a house, using Edna Mae Thurner's funds to make the purchase. Approximately a year later this house was sold by Edna Mae Thurner at a profit and the proceeds were invested in another house. Edna Mae Thurner continued, over a period of years, the practice of purchasing houses and reselling them at a profit. In 1927 petitioner Thurner left the bank where he was employed and entered the real estate and building business with his wife. Edna Mae Thurner managed the office while her husband performed the field work. In 1936 petitioner Thurner and his wife, together with petitioner Ries and his wife, went into the builders' supplies business by incorporating the Modern Builders Supplies Company. Edna Mae Thurner was made president of this corporation and she drew a salary as such. Petitioner Ries managed the business and his *353 wife worked in the office from 1936 to the fall of 1938 without salary. The Modern Builders Supplies Company was subsequently changed to a partnership between petitioners Thurner and Ries. Petitioner Ries and his wife, Ethel M. Ries, were married in 1926. Prior to her marriage Ethel Ries had worked in the Norwood Sash and Door Company. In 1929 petitioner Ries and his wife constructed a home costing approximately $11,000, toward which Ethel Ries contributed approximately $1,000. This house was sold in 1935 and the proceeds therefrom were invested in the Modern Builders Supplies Company. Petitioner Ries and his wife purchased another home in 1939 which they sold in 1943. The proceeds of this sale were invested in Government bonds taken in the name of Ethel Ries. In 1939 George Thurner and his wife were advised by their attorney to separate their property holdings because their purchases of real estate had been made without regard to a proper segregation of ownership. George and Edna Thurner came to an agreement on December 31, 1939, by which petitioner Thurner paid $100,000 for his wife's property interests by means of a note which was eventually paid in full. Following this agreement *354 the Thurners maintained separate books of account and individual bank accounts in different banks. Modern Builders Supplies Company, the partnership between George Thurner and Norman Ries, acquired 50 per cent of the stock of the Acme Sash and Door Company of Cincinnati, Ohio, hereinafter sometimes referred to as the Acme Company. A disagreement concerning business policy arose in the Acme Company between Thurner and Ries and the holders of the other 50 per cent of the stock. George Thurner did not have sufficient funds to purchase the remaining stock. His wife, who had enough money to make the purchase, agreed to go into the organization. Petitioner John L. Scheper, also a stockholder, managed the Acme Company at this time. George Thurner and his wife, together with petitioners Scheper and Ries and their wives, succeeded in purchasing the remaining stock of the Acme Company from the other shareholders. Stock certificates were issued to the new stockholders. The stock was held in the following proporties: George Thurner
22.5%
Edna Thurner
22.5%
Norman Ries
15.0%
Ethel Ries
15.0%
John Scheper
12.5%
Elizabeth Scheper
12.5%
The acquisition of the remaining Acme stock was made in December, 1943. George *355 Thurner made the purchase as agent for the women, having borrowed sufficient funds for this purpose from his wife and a bank. Petitioner Thurner received payment for these advancements he had made by means of checks from his wife and Elizabeth Scheper and a note from Ethel Ries, which was paid in March, 1944. Edna Mae Thurner mortgaged one of her real estate holdings to secure a loan from a trust company to pay for her stock in the Acme Company. This loan was repaid in January, 1945. In March, 1944 Ethel Ries paid off the note she had given to George Thurner for the advance on the purchase price by selling the Government bonds that had previously been bought in her name. Elizabeth Scheper borrowed $18,200 from George Thurner to buy Acme and other stock. This loan was repaid with interest without financial aid from her husband. John Scheper remained with the Acme Company as the salaried manager. None of the other petitioners actively participated in the management of the business. On February 1, 1944, the petitioners and their wives entered into a partnership agreement for the operation of the Acme Company, the corporation having been dissolved. The reasons for creating a partnership *356 in preference to the corporation were the expectation of a tax saving and the belief that John Scheper would be more closely tied to the business by means of a partnership. The partnership agreement gave George Thurner final authority to determine managerial policy in the event of disagreement. The former stockholders' interests were maintained in the same proportion in the new partnership. The income of the partnership was distributed in accordance with the proportionate interest of each partner. Not all the profits of the Acme Company were distributed each year. Late in 1943 petitioners Thurner and Ries and their wives became interested in the Allen A. Smith Company of Toledo, Ohio, hereinafter sometimes called the Smith Company, which was engaged in a line of business similar to the Acme Company. In January, 1944, an agreement was entered into by George Thurner for the purchase of the assets of the Smith Company by petitioners Thurner, Ries and Scheper, and their wives. None of the petitioners or their wives had any previous financial interest in the Smith Company. George Thurner, acting as agent, consummated the transaction by making the down payment on the purchase price. On February *357 1, 1944, the petitioners and their wives entered into a partnership agreement to operate the Smith Company. The partnership interests were as follows: George Thurner
30%
Edna Mae Thurner
30%
Norman Ries
15%
Ethel Ries
15%
John Scheper
05%
Elizabeth Scheper
05% George Thurner had final authority, under the partnership agreement, to determine policies in case of disagreement. George Thurner paid for his 30 per cent interest by means of a check to the Allen A. Smith Company, together with the down payment made by him. Edna Mae Thurner paid for her 30 per cent interest by means of two checks payable to the Smith Company drawn upon her own funds. In February, 1944, petitioner Ries and his wife paid for their respective 15 per cent interests in the Smith Company partnership by checks payable to the Smith Company. In February of 1944, petitioner Ries gave his wife $16,000 to be used for investment in the Smith Company. Petitioner Scheper paid for his 5 per cent interest by check drawn on February 6, 1944. To raise this money Scheper borrowed $2,200 from George Thurner, which he repaid with interest in January, 1945. Elizabeth Scheper paid for her 5 per cent partnership interest by a check drawn to *358 the Smith Company. This amount was derived from the money borrowed from George Thurner, which was subsequently repaid to him. A salaried manager was employed to run the Smith Company. None of the petitioners actively engaged in the business. The income of the Smith Company was distributed among the partners according to their proportionate interest. The petitioners received no part of their wives' distributive shares of partnership income, which were treated by the wives as their own funds. The petitioners' wives had separate bank accounts and their husbands did not have the authority to draw upon these accounts. The partners held meetings at which matters of policy of both partnerships were discussed. The legal responsibilities and liabilities of partnerships had been fully explained to all parties before either partnership was created. The respondent determined that the income from the partnerships which was allocated to the wives of the petitioners was attributable to the petitioners. The petitioners and their wives formed two bona fide partnerships and truly intended to join together for the purpose of carrying on the businesses as partnerships. II. Facts relative to the deduction *359 of certain business expenses. In 1945 the Allen A. Smith Company spent $1,983.54 in having work done to the bricks and roof of its buildings. The work consisted of pointing up bricks and mortar in the building and repairing the flat roof and parapet walls. Similar work had been done in 1944. Similar work was later performed in 1949 and 1950. The respondent determined that this expense was a capital expenditure and not a business expense. III. Facts relative to the depreciation of certain improvements. Capital expenditures of $4,735.20 were made in 1945 by the Acme Sash and Door Company upon the building occupied by it under a lease from the trustee for Helen Mae Thurner, George Thurner, Jr., and William Andrew Thurner, children of petitioner George Thurner. The lease commenced on February 1, 1944, and was to run for five years. At the time the expenditures were made the lease had 43 months yet to run. The Acme Company had continued to occupy the premises on a month-to-month tenancy since 1949. The lease has not been renewed and other offers for rental of the property have been made to the trustee. The respondent has determined that these expenditures should be depreciated over a *360 20 year period rather than the term of the lease. IV. Facts relative to the issues concerning the sale of certain real property by George E. Thurner. In the fall of 1929 George Thurner entered into an agreement with Henry Ferguson, a service station operator in Cincinnati, to construct a new gas station for Ferguson. The price was fixed at cost plus $3,000. In the process of constructing the new station, petitioner Thurner purchased a lot for $1,200 and entered into a lease-purchase agreement with a development company. Upon starting the construction job, George Thurner had torn down the old building standing on the property. He then discovered that the development company held an interest in the property and when threatened with suit for destruction of the building, he entered into a long-term lease-purchase agreement. Petitioner Thurner also spent $6,000 in payment of unpaid bills as part of this transaction. The cost of constructing the gas station was $12,024.50. Ferguson operated the gas station when completed, but in 1939 he fell behind in the payments on his debt to George Thurner. In 1940 an agreement was reached whereby George Thurner received the service station as payment *361 in full of Ferguson's debt. The petitioner carried the property on his books at a value of $19,224.50. Petitioner Thurner took over the operation of the gas station in 1940 but was forced to close the business in 1943. The operation of the service station did not succeed because of the advent of gasoline rationing and tire restrictions. In December, 1944, petitioner Thurner sold the gas station for $6,000. The respondent disallowed a deduction of a loss on the sale of this property in 1944 in the amount of $11,589.08. The petitioner suffered a deductible loss of $8,500 on the transaction. V. Facts relating to classification of property. In 1942 petitioner Thurner was advised by his doctor to quit the real estate business which he had conducted since 1927. Upon the advice of counsel, George Thurner segregated his real estate holdings into investment and sale properties on his books and records. He completed the buildings he had started in 1942. His records carried real properties as investments after 1942 and he did not maintain a real estate account. In his 1943 income tax return, George Thurner listed certain real estate holdings as investment property in reporting the income from *362 them. The buildings on these properties had been built by petitioner Thurner in 1942 and were sold in 1944 and 1945 and returned for income tax purposes as the sale of property held for investment purposes. In 1945 George Thurner was listed in the directory of the Cincinnati Suburban Bell Telephone Company as a building contractor. This listing was canceled in 1945 by petitioner Thurner and as a result he lost one telephone in his home. George Thurner was licensed in Ohio as a real estate broker in 1944 and 1945, and during this period he was also a member of the Home Builders Association. The respondent has determined that the gains from the sale of these properties were profits from the sale of properties held primarily for sale in the ordinary course of business and not capital assets. Opinion VAN FOSSAN, Judge: The principal issue common to all of these cases is whether or not the wives of the petitioners were bona fide members of the two partnerships and thus taxable upon their distributive share of partnership income. The ultimate finding of fact appearing above is dispositive of this issue. The wives were bona fide members of the two partnerships. A second issue is common to *363 all the petitioners. In reporting the partnership net income for 1945, the expenses of work done to the brick and roof of the building occupied by the Allen A. Smith Company were deducted. The respondent determined that such work constituted capital improvements for which no deduction can be allowed [2] and here relies upon the presumption of correctness which attaches to that determination. We hold this presumption to have been overcome by the evidence demonstrating the character and recurring nature of this repair work which was necessary to maintain the building in proper condition. No substantial increase in value resulted from the work. It was merely the restoration of the asset to a useful state. Pierce Estates, Inc., 16 T.C. 1020. Also, in 1945, capital expenditures were made by the Acme Company which rented the improved property from the trustee for the children of George and Edna Thurner. Capital *364 improvements to rented property are ordinarily depreciated over the term of the lease under section 23 (1) of the Internal Revenue Code. [3] Otherwise, a lessee loses part of what he has contributed when the lease expires. If the tenancy, however, is without term and continues for an indefinite period, the allowance for depreciation must be based upon the life of the improvements. Standard Tube Company, 6 T.C. 950; Rankin v. Commissioner, 60 Fed. (2d) 76, affirming 17 B.T.A. 1301. In the present instance the original tenancy was five years but has been continued beyond the five-year term and still continued on a month-to-month basis at the time of trial. Upon the facts, we hold in favor of the respondent upon this issue and require that the depreciation be spread over the life of the improvements. The remaining issues in these consolidated proceedings concern petitioner George Thurner alone. In *365 1944 petitioner Thurner sold for $6,000 the gas station which he had unsuccessfully tried to operate. In that year he claimed a loss on this sale. The property was originally acquired in 1940 as payment in full of the debt of Henry Ferguson. The respondent contends that no loss can be allowed because the petitioner has failed to prove the fair market value of the property in 1940. This value is the basis of the property for determining gain or loss on subsequent sale or when a creditor receives the property from his debtor in satisfaction of the debt. I.T. 3548, Cum. Bull. 1942-1, 74. The evidence relating to 1940 fair market value is the testimony of George Thurner that he thought the property was worth the $19,224.50 he had spent on it. Also in the record are opinions of two professional appraisers that the property would have been worth respectively $17,926 and $18,161.60 in 1940. Their methods of arriving at these figures do not persuade us of their soundness in the present situation. Thurner spent $6,000 in settling the claims against the property when he was not its owner and he entered into a longterm lease-purchase agreement because he was threatened with suit for tearing down *366 the building that stood on the property. It is also important to note that he took over the property from a debtor who was unable to maintain payments on his debt. In view of this and other evidence and testimony, we have concluded and find that the fair market value as of 1940 to be employed as the basis for determining gain or loss was $14,500. The final issue concerns the sale of real property by George Thurner in 1944 and 1945. Petitioner Thurner maintains that the properties were held for investment rather than for sale in the ordinary course of business and that they should be treated as capital assets under section 117 (a), I.R.C.[4] Prior to 1943, George Thurner was engaged in the building and real estate businesses. The petitioner contends that he went out of the building business in 1942. The petitioner's books and records underwent a change to the extent that there was no longer a real property account labeled "Real Estate" but there was one labeled "Investments". George Thurner built several buildings in 1942 after his withdrawal from the building business. The petitioner, for various reasons, continued his telephone listing as a real estate dealer, maintained his real *367 estate license and his membership in a real estate organization. His explanations of these facts are not impressive. It is settled that a real estate dealer may also hold properties for investment purposes. Nelson A. Farry, 13 T.C. 8. The facts, however, must clearly show that the property is held for investment purposes. Upon all the facts before us, we have come to the conclusion that the petitioner has not established that he held the properties for investment rather than as part of his real estate business. The respondent is affirmed on this issue. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: John L. Scheper, Docket Nos. 25814, 27419; and Norman P. Ries, Docket Nos. 25840, 27467.↩
1. Proceedings of the following petitioners are consolidated herewith: John L. Scheper, Docket Nos. 25814, 27419; and Norman P. Ries, Docket Nos. 25840, 27467.↩
2. SEC. 24. ITEMS NOT DEDUCTIBLE. (a) General Rule. - In computing net income no deduction shall in any case be allowed in respect of - * * *
(2) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate; * * *↩
3. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(1) Depreciation. - A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business, * * *↩
4. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital Assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * *.↩