T.C. Memo. 2002-8

UNITED STATES TAX COURT

GEORGE TSAKOPOULOS AND DROUSOULA TSAKOPOULOS,
Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 14050-98, 1131-00.          Filed January 9, 2002.

John Gigounas, for petitioners.

Daniel J. Parent, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, Judge: Respondent determined the following
deficiencies in petitioners' Federal income taxes:

| Year | Deficiency |
|------|------------|
| 1993 | $148,920 |
| 1994 | 78,684 |
| 1995 | 280,384 |
| 1996 | 62,439 |

After concessions, the issues for decision are: (1) Whether a preliminary change of ownership report filed with the Sacramento County Assessor's Office is admissible; (2) whether petitioners may take a deduction for an abandonment loss; (3) whether petitioners must report income from cancellation of indebtedness with regard to advances received; (4) whether petitioners may deduct expenses incurred on work performed on the roofs of their shopping centers; (5) whether petitioners may deduct real estate taxes paid; and (6) whether petitioners may deduct payments made to Royal Roofing, Inc., and Consolidated Electrical Distributors.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. At the time they filed their petition, George Tsakopoulos (hereinafter, petitioner) and Drousoula Tsakopoulos resided in Carmichael, California.

Petitioner moved to the Sacramento area in 1960 and began to buy old houses, remodel them, and rent them. Petitioner used this rental income to pay the mortgages, to reinvest, and as a source of income. In 1965, petitioner began to purchase other types of properties (e.g., ranches, farms, shopping centers).

Stockton/Elsie Property

In 1989, petitioner purchased a 22.14-percent interest in the Stockton/Elsie property (Stockton/Elsie) from SKK Exchange for $390,867.[1] At the time of purchase, Angelo Tsakopoulos (hereinafter, Angelo), petitioner's brother, already owned an 8.18-percent interest in Stockton/Elsie.[2] From 1958 until 1989, Stockton/Elsie operated as a gasoline and diesel dispensing facility, a vehicle washing facility, and a mechanical repair and maintenance operation facility. Prior to 1979, other entities held the interests in Stockton/Elsie, including Phillips Petroleum Co., Lion Oil Co., and its successor Tosco Corp. From 1979 to 1989, Angelo was principally responsible for managing the property, although many other parties held ownership interests.

---

[1] Amounts are rounded to the nearest dollar.

[2] Angelo often conducted business under the name AKT Development or AKT Investments.

Other owners at petitioner's time of purchase included SKK Exchange, Inc. (14.68 percent), Jack Sioukas (17 percent), and Eppie Johnson (38 percent).

By 1994, Angelo owned 77.86 percent of Stockton/Elsie, and petitioner owned the remaining 22.14-percent interest.

Angelo attempted to sell Stockton/Elsie in 1985; the sale, however, did not occur because the prospective purchaser learned that Stockton/Elsie would need to be cleaned up due to contamination. In 1987 and 1988, Angelo received reports which confirmed contamination in Stockton/Elsie's soil and groundwater. On March 17, 1992, Angelo filed a lawsuit against several oil companies, including Phillips Petroleum, former owners and tenants, and insurance companies alleging that they were responsible for the cleanup costs. In 1993, the California Regional Water Quality Control Board issued a cleanup and abatement order on Stockton/Elsie to certain past and present owners, including Angelo. Petitioner deducted his share (i.e., 22.14 percent) of these toxic cleanup expenses on his 1993 and 1994 tax returns, and respondent allowed these expenses. Angelo advanced these expenses to petitioner. By 1995, petitioner had not paid these amounts back to Angelo.

On August 1, 1995, due to his health problems, financial problems, and fear of potential lawsuits regarding the contamination of Stockton/Elsie, petitioner deeded his entire interest in this property to Angelo. This deed was recorded on January 21, 2000. The deed indicated that there was no value to Stockton/Elsie.

On January 21, 2000, Karen Hayes, an escrow assistant at the Placer Title Co., filed a preliminary change of ownership report with the Sacramento County (the County) Assessor's Office regarding the transfer of Stockton/Elsie from petitioner to Angelo. This form must be filed whenever there is a conveyance of title record in order for the office to assess the property. The box on the report indicating that the transfer was a "purchase" was checked, and the box for the total purchase price was filled in with $291,483. Angelo's name on the report was signed by Ms. Hayes. No one from Angelo's office advised Ms. Hayes that the transfer was a "purchase"; however, she filled out the form using the deed given to her by AKT and marked what she believed was "appropriate". In addition, the purchase price, which was provided by Angelo's escrow coordinator, Jean Perry, represented the assessed value of 100 percent of the property, not solely petitioner's 22.14-percent interest.

On his 1995 tax return, petitioner claimed a $205,949 loss for the abandonment of Stockton/Elsie. The amount of the loss represented petitioner's basis in Stockton/Elsie as calculated by petitioner's tax preparer, Norman Marcoux. In the notice of deficiency, respondent disallowed the loss. Respondent determined that petitioner had not established an abandonment loss, and the loss was not allowable because it was the result of a transaction with a related party. In addition, respondent

disallowed an additional deduction of $184,918 which petitioner claimed on his amended return as part of the abandonment loss on Stockton/Elsie.

Respondent also determined that petitioner had $111,229 of cancellation of indebtedness (COD) income from the discharge of indebtedness upon the disposition of the property. This amount represents the advances from Angelo to petitioner for expenses related to the cleanup.

Cirby/Sunrise Shopping Center Roof

In May 1993, petitioner received a bid from Robert Graham of Gudgel/Yancey Roofing, Inc., for the latter to perform work on the roof of the Cirby/Sunrise Shopping Center (Cirby/Sunrise). The bid proposed the following work:

> Remove the existing roof and haul same from the premises. Prepare the deck for the application of the new roof.

> Install a rosin sheet on the wood deck.

> Nail two layers of Malarkey Roofing Products #501 SBS base sheets to plywood deck, each layer embedded with asphalt.

> Apply one layer of Malarkey Roofing Products #601 granulated SBS cap sheet in asphalt.

> Nail one layer of Malarkey Roofing Products #502 cap sheet and one layer of #601 cap sheet to existing stucco wall.

> Remove and reinstall existing cap metal.

> Replace cant strip as necessary.

The proposal was for the entire builtup roof, which represents the top flat portion of the roof; the proposal did not cover any work on the tile portion of the roof which bordered the builtup roof, the plywood deck beneath the builtup roof, or the supporting structures. In June 1993, petitioner paid Gudgel/Yancey Roofing $63,000 for this work. Mr. Graham inspected the completed work, which had a warranty of 10 years.

On his 1993 return, petitioner claimed a deduction for repairs to Cirby/Sunrise of $41,530. Respondent disallowed $31,500[3] of this deduction and determined that this amount is a capital expenditure.

Carmichael Village Shopping Center Roof

In addition, petitioner contacted Mr. Graham because the roof above 12 suites at the Carmichael Village Shopping Center (Carmichael Village) was leaking.[4] Mr. Graham determined that the contractor that put on the original roof had done a poor job, and he decided to tear off the original roof and put on a new roof. In August 1994, petitioner received a proposal from Gudgel/Yancey Roofing to perform work on this roof. The work detailed in this proposal mirrored the proposal on Cirby/Sunrise except that the roof jacks would be replaced, as necessary, and

---

[3] The amount of $31,500 represented petitioner's 50-percent interest in the shopping center.

[4] Suites 1 through 12 comprised about 10 percent of the entire shopping center.

the proposal did not include the work of applying one Malarkey Roofing Products #502 cap sheet and one #601 sheet to existing stucco walls. In September 1994, petitioner paid Gudgel/Yancey Roofing $27,000 for this work. Mr. Graham inspected the completed work, which had a warranty of 10 years.

On his 1994 tax return, petitioner deducted $65,319 as repairs to Carmichael Village. Respondent disallowed $32,732[5] and determined that these amounts were capital expenditures.

Payment to Royal Roofing, Inc.

In November 1995, petitioner paid $30,000 to Royal Roofing, Inc.

On his 1995 tax return, petitioner deducted $84,815 as repairs for Carmichael Village. Respondent reduced this amount by $72,887 and determined that petitioner had not established that the expenses were ordinary and business expenses. Of this amount, respondent determined that the $30,000 paid to Royal Roofing was not a "repair" because petitioner had not provided sufficient documentation to establish the nature of the work.

---

[5] This amount represented $27,000 paid to Gudgel/Yancey Roofing plus $5,732 of other repairs, which the parties have stipulated are not deductible as repairs or capital items in 1994.

Real Estate Taxes Paid in 1995 for Calvine 120/140

In the late 1960s, petitioner purchased two properties identified as Calvine 120 and Calvine 140 (Calvine 120/140).[6] When he purchased Calvine 120/140, a dairy and two houses were located on the properties. Petitioner continued to rent Calvine 120/140 to the same tenant. At the time of purchase, Calvine 120/140 was zoned for agricultural and residential development purposes. Petitioner purchased Calvine 120/140 for income purposes.

In 1975, the County condemned the dairy farm because cow urine caused problems with a nearby stream, so petitioner used Calvine 120/140 as a cow pasture. The County did not fix the drainage on Calvine 120/140; therefore, petitioner could not develop these properties.

In 1982, the County changed the zoning for Calvine 120/140 to light industrial. In 1992, the County again changed the zoning to special planned development (SPA). The SPA zoning allowed only certain areas of Calvine 120/140 to be zoned as commercial, residential, and recreational. Petitioner did not advocate the zoning changes. In 1995, however, petitioner attempted to change the zoning from SPA to residential because

---

[6] Calvine 120 consisted of approximately 120 acres at Calvine Road, and Calvine 140 consisted of approximately 140 acres at Calvine Road.

the zoning restrictions were depressing the value of Calvine 120/140. Petitioner filed a letter with the County outlining his plans to subdivide Calvine 120/140 into 947 single-family lots and other sites.

On his 1995 tax return, petitioner deducted real estate property taxes of $26,985 for Calvine 120, and $35,180 for Calvine 140. Respondent disallowed the deduction and determined that the amounts were capital expenditures.

Payment to Consolidated Electrical Distributors

On December 29, 1995, petitioner paid Consolidated Electrical Distributors $7,472 from his Greenhaven Plaza bank account. On his 1995 tax return, petitioner deducted this amount as a repairs expense with respect to his Greenhaven property. Respondent disallowed this amount because petitioner did not establish the amount as an ordinary and necessary business expense.

OPINION

I. Evidentiary Issue

As a preliminary matter, petitioner objects to the admission of the preliminary change of ownership report (the report) as hearsay. At trial, the Court admitted the exhibit under advisement, reserving ruling on the objection until parties briefed the issue.

Respondent argues that the report is admissible under the following hearsay exceptions of the Federal Rules of Evidence: rule 803(6), Records of regularly conducted activity; rule 803(8), Public records and reports; and rule 803(15), Statements in documents affecting an interest in property.

Petitioner argues that the report cannot be admitted under Fed. R. Evid. 803(15) because the report does not affect an interest in property.

Under Fed. R. Evid. 803(15), there are three elements for its application: (1) The document must purport to establish or affect an interest in property; (2) the statement must be relevant to the purpose of the document; and (3) subsequent dealings with the property cannot be inconsistent with the truth of the statement or the purport of the document.[7]

The document affects an interest in property. The Court has held that statements, imprints, and notations of transfer tax

---

[7] Fed. R. Evid. 803(15), provides:

   The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

   (15) Statements in documents affecting an interest in property.--A statement contained in a document purporting to establish or affect an interest in property if the matter stated was relevant to the purpose of the document, unless dealings with the property since the document was made have been inconsistent with the truth of the statement or the purport of the document.

authorities on documents are admissible under Fed. R. Evid. 803(15) as statements in documents affecting an interest in property. deRochemont v. Commissioner, T.C. Memo. 1991-600. Similarly, the report involves the assessment of taxes on the property. Further, the report is required to be filed in order for the State authorities to assess tax on the property concerned. Cal. Rev. & Tax. Code sec. 480.3 (West 1998).

The statements within the report are relevant to the purpose of the document--to assess the correct tax. In addition, subsequent dealings with the property are not inconsistent with the truth of the statement or purport of the document because Angelo owns the entire property.

Accordingly, we admit this document into evidence under rule 803(15) of the Federal Rules of Evidence.

II. Stockton/Elsie Property

A. Abandonment Loss

Respondent argues that petitioner is not entitled to the deduction for an abandonment loss because: (1) Petitioner exchanged the property for Angelo's guaranty that he would not be responsible for any expenses that Angelo had already paid on the property and future liabilities; (2) petitioner held the property for the benefit of Angelo, and the property was, therefore, not transferred to Angelo because Angelo already owned it; or (3) petitioner did not abandon the property but transferred it to his

brother.  Petitioner argues that he is entitled to an abandonment loss deduction for his interest in Stockton/Elsie property for 1995 in the amount of $390,867.

Section 165(a) allows a deduction for any uncompensated loss sustained during the taxable year.  This loss must be incurred in a trade or business, in any transaction entered into for profit, or in a casualty or theft.  Sec. 165(c).  The amount of the loss is the adjusted basis of the property.  Sec. 165(b).

To be entitled to an abandonment loss under section 165, a taxpayer must show:  (1) An intention on the part of the owner to abandon the asset, and (2) an affirmative act of abandonment. Citron v. Commissioner, 97 T.C. 200, 208 (1991).  An affirmative act of abandonment must be ascertained from all the facts and circumstances, United Cal. Bank v. Commissioner, 41 T.C. 437, 451 (1963), affd. per curiam 340 F.2d 320 (9th Cir. 1965), and "the Tax Court [is] entitled to look beyond the taxpayer's formal characterization", Laport v. Commissioner, 671 F.2d 1028, 1032 (7th Cir. 1982), affg. T.C. Memo. 1980-355.  The loss is allowed for the year in which the act of abandonment takes place.  See Buda v. Commissioner, T.C. Memo. 1999-132; sec. 1.165-1(d)(1), Income Tax Regs.

Petitioner transferred the property to Angelo by deed. Under California law, a deed need not be recorded when delivered to be effective.  Douglas v. Commissioner, T.C. Memo. 1989-592.

We have held that abandonment cannot occur if the transferor intends for a particular person to be the transferee. Strandquist v. Commissioner, T.C. Memo. 1970-84.  We stated:

> Abandonment must be made by the owner, without being pressed by any duty, necessity, or utility to himself, but simply because he no longer desires to possess the thing; and, further, <u>it must be made without any desire that any other person shall acquire the same</u>; for if it were made for a consideration it would be a sale or barter, and if without consideration, but with intention that some other person should become possessor, it would be a gift. * * * [Emphasis added.]

Id.  Similarly, the California Supreme Court has stated that abandonment does not result when the property is delivered and accepted by a donee.  Richardson v. McNulty, 24 Cal. 339, 344 (1864); see also Commissioner v. Estate of Bosch, 387 U.S. 456, 465 (1967) (The decisions of the State's highest court are conclusive as to that State's law).  That court stated that "If the gift be complete--that is to say, if the thing given be delivered, and accepted by the donee, a transfer is the result, which transfer as much precludes the idea of abandonment as a transfer resulting from a sale".  Richardson v. McNulty, supra.  In addition, the court characterized "abandonment" as leaving the property "free to the occupation of the next comer, whoever he may be, without any intention to repossess or reclaim it for himself in any event, and regardless and indifferent as to what may become of it in the future".  Id. at 345.

Petitioner signed a deed conveying his interest in the property to his brother, with the intent of his brother possessing the property. On the basis of the record before us, we find that petitioner did not abandon the property. Accordingly, we hold that petitioner is not entitled to a deduction for an abandonment loss with regard to the Stockton/Elsie property in 1995.

B.   Cancellation of Indebtedness (COD) Income

Respondent argues that petitioner must recognize income in 1995 of $111,229. This amount is the total amount Angelo paid in 1993 and 1994 on behalf of petitioner with regard to cleanup expenses related to the Stockton/Elsie property. Respondent contends that because petitioner has not repaid the amount and Angelo has not attempted to collect it, petitioner should recognize the amount as COD income in 1995, when the property was transferred to Angelo. Petitioner argues that the debt owed to Angelo was outstanding in 1995 and petitioner had a "good faith intent" to repay these advances.

"Income from discharge of indebtedness" is included in gross income. Sec. 61(a)(12). Petitioner and Angelo testified at trial regarding these advances. Having observed petitioner's and Angelo's appearances and demeanors at trial, we find their testimonies on this issue to be honest, forthright, and credible.

Angelo testified that it was common for him to advance to the other owners the funds to pay the expenses on a property. He further testified that he treated the advances as loans and interest accrued on the advances.[8] Angelo also stated that he does not pursue collection on these loans actively. For example, Angelo testified:

> I got a call a few days ago from a fellow by the name of Sammy C. Actually, not him, got a call from an agent that says "Hey, Sammy has on his financial statement that he owes you money from 1985."
>
> He says "What's the deal?" Said, "Gee whiz, he does owe it to
>
> But Sammy was--couldn't pay for a long time. "Well, is he going to pay you?"
>
> "Yeah, he'll pay me."
>
> "When?"
>
> "Well, when he can." He's not a relation or anything. I've never filed a lawsuit against him. He has sufficient money for me to go after him but I'm not going to break the guy to collection a few hundred thousand dollars.

In addition, petitioner testified that he considered the advances to be loans that he still owed and intended to pay back. Upon the basis of the record, we find the amounts advanced to petitioner by Angelo still owing. Therefore, we hold that

---

[8] Angelo's accountant, Mark Enes, further testified that Angelo did not favor petitioner on the interest rate charged to petitioner.

petitioner does not have COD income in the amount of $111,229 for 1995.

III.   Shopping Center Roofs

   A.   Cirby/Sunrise Shopping Center Roof

Respondent argues that the cost of replacing the roof on the Cirby/Sunrise shopping center must be capitalized.  Respondent contends that "An entire component of the building--the roof--was removed and replaced".  Respondent further argues that the new roof prolonged the life of the property.  Petitioner argues that the work on the roof was of the nature of a repair for the purpose of keeping the roof in "ordinary operating condition".  Petitioner argues that, because the work on the roof was repairs, the cost could be deducted in the year paid.

Section 162 allows the deduction of "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  Section 1.162-4, Income Tax Regs., further provides:

> The cost of incidental repairs which neither materially
> add to the value of the property nor appreciably
> prolong its life, but keep it in an ordinarily
> efficient operating condition, may be deducted as an
> expense * * *.  Repairs in the nature of replacements,
> to the extent that they arrest deterioration and
> appreciably prolong the life of the property, shall
> * * * be capitalized * * *.

Section 263(a) provides that no deduction shall be allowed for (1) "Any amount paid out for new buildings or for permanent

improvements or betterments made to increase the value of any property or estate", or (2) "Any amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made". Sec. 263(a)(1) and (2); <u>Wolfsen Land & Cattle Co. v. Commissioner</u>, 72 T.C. 1, 14 (1979). Within the scope of section 263(a)(1) are those amounts paid or incurred (1) to add to the value, or substantially prolong the useful life, of property owned by the taxpayer, or (2) to adapt property to a new or different use. Sec. 1.263(a)-1(b), Income Tax Regs.

An important factor in determining whether the appropriate tax treatment is immediate deduction or capitalization is the taxpayer's realization of benefits beyond the year in which the expenditure is incurred. <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 87 (1992); <u>United States v. Wehrli</u>, 400 F.2d 686, 689 (10th Cir. 1968). This is not an absolute rule, however, as the benefits of expenditures considered to be currently deductible as repairs sometimes extend beyond the current year, as would be true, for example, of the cost of replacing a broken windowpane. <u>United States v. Wehrli</u>, <u>supra</u>.

Whether an expenditure may be deducted or must be capitalized is a question of fact. <u>INDOPCO, Inc, v. Commissioner</u>, <u>supra</u> at 86. Thus, "Courts have adopted a practical case-by-case approach in applying the principles of capitalization and deductibility." <u>Norwest Corp. & Subs. v.</u>

Commissioner, 108 T.C. 265, 280 (1977) (quoting Wolfsen Land &
Cattle Co. v. Commissioner, supra).

Petitioner cited several cases to support his argument that
the nature of the work on the roof was repairs, including
Vanalco, Inc. v. Commissioner, T.C. Memo. 1999-265, Pierce
Estates, Inc. v. Commissioner, 16 T.C. 1020 (1951), Thurner v.
Commissioner, 11 T.C.M.(CCH) 42 (1952), Pontel Family Estate v.
Commissioner, T.C. Memo. 1981-303, and Rev. Rul. 2001-4.  In each
of these cases and in the revenue ruling, the Court held that
certain work performed should be characterized as repairs and
deducted rather than capitalized.  These situations are
distinguishable from the instant case because they involved
instances in which the repairs were of a recurring nature, part
of a regular maintenance program, or necessary due to storm
damage.  None of the situations in the cited cases or revenue
ruling is applicable in the instant case--petitioner did not
offer evidence that he performed work on his roof on a recurring
basis or that the work was to repair damage caused by a storm.
Therefore, we find the cases and revenue ruling cited by
petitioner distinguishable from the instant case.

Petitioner presented an expert witness, Robert Cox, who
testified that the entire roof was not replaced, that many
components were reused, and that the work was of poor quality so
that it did not prolong the life of the roof nor materially add

to its value.  Mr. Cox concluded that the work was "merely incidental repairs".

Respondent presented Robert Graham from Gudgel/Yancey Roofing, Inc., the person who supervised the roof work on the Cirby/Sunrise shopping center.  We found Mr. Graham's testimony to be honest, forthright, and credible.  Mr. Graham testified that the work was a "re-roofing project" in which:

> We go to a roofing system that's old and needs to be replaced, and we go there and we tear it off.  We remove the roofing from the existing plywood, and then by the time everything is torn off, we'll be looking at old plywood.
>
> We replace whatever needs to be replaced in the way of plywood, and then we go--start installing our roofing systems.  * * *

Mr. Graham stated that he replaced the entire builtup portion of the roof, but "that is the entire roof".  Mr. Graham stated that he reviewed the work during its application and on completion with the representative of the roofing system manufacturer because the new roof is under warranty for 10 years.

After considering the work completed and Mr. Graham's credible testimony, we find that petitioner replaced the roof. Additionally, the replacement roof is expected to last 10 years, prolonging the roof's useful life.  We believe that the replacement of the builtup portion of the roof was of a

substantial nature to render it a capital expenditure.[9] See Stark v. Commissioner, T.C. Memo. 1999-1.

    B.    Carmichael Village Shopping Center Roof

Respondent argues that the cost of replacing the roof on the Carmichael Village shopping center (suites 1-12) must be capitalized.  Petitioner argues that the work was in the nature of repairs for the purpose of keeping the roof in ordinary operating condition.

Mr. Graham, who also managed this roofing project, testified as to the work completed.  Mr. Graham testified that the contractor of the original roof had done a poor job, and "we had no choice but to tear it off and completely put a new roof on it".  Mr. Graham further testified that "an entire roof" was replaced, but only for 10 percent of the entire shopping center.  Mr. Graham stated that the new roof had a 10-year warranty.

Petitioner contends that our holding in Vanalco, Inc. v. Commissioner, supra, applies to the case in issue, pointing out that the taxpayer in Vanalco replaced only 10.6 percent of the roof.  We disagree.  The facts in Vanalco are distinguishable from the instant case.  In Vanalco, there was no evidence that

---

[9] Petitioner's expert, Mr. Cox, testified that the tile roof has a longer life expectancy than the builtup roof and should not need to be replaced as often.  The tile roof is a separate component from the builtup portion with a different useful life.

the work provided a functional improvement to the roof, materially added to the value of the property, or would appreciably prolong the life of the roof. Id. In the instant case, Mr. Graham credibly testified that the new roof had a 10-year warranty, prolonging the life of the property. Additionally, in Vanalco, the work on the roof was performed during ordinary maintenance which occurred almost every year. In the instant case, however, no evidence was presented to indicate that the work performed on the roof was of a recurring nature.

Although petitioner replaced the roof of 10 percent of the entire shopping center, we note that the entire builtup roof of that section was replaced. This section encompassed the roof above 12 separate suites. After considering the evidence, we hold that the cost of the work performed on the roof must be capitalized because of the substantial nature of the work performed and the work appreciably prolonged the life of the roof.

C.   Payment to Royal Roofing, Inc.

Respondent argues that petitioner's $30,000 payment to Royal Roofing, Inc., should not be allowed as a deduction for 1995 because petitioner presented no evidence as to the business purpose of the payment. Petitioner argues that he established the business nature of this payment and it is deductible.

Deductions are a matter of legislative grace, and petitioner bears the burden of proving that he is entitled to the deductions claimed. Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). The taxpayer bears the burden of substantiating the amount and purpose of the item for the claimed deduction. See Hradesky v. Commissioner, 65 T.C. 87, 90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976).

Petitioner testified that he could not obtain the invoices from Royal Roofing; he did not testify as to the purpose of the payment. Mr. Cox, petitioner's expert, testified that Royal Roofing performed the work because "someone" had told him that Royal Roofing had done the work. Mr. Cox did not talk to Royal Roofing or see any invoices or proposals from Royal Roofing. Accordingly, we do not place any weight on Mr. Cox's testimony regarding Royal Roofing.

Petitioner has not established that the payment to Royal Roofing was a business expense. Accordingly, we sustain respondent's determination on this issue.

IV. Payment of Real Estate Taxes on Calvine 120/140

Respondent argues that petitioner must capitalize the real estate taxes paid in 1995 on the Calvine 120/140 property because, at the time they were incurred, it was reasonably likely that petitioner would subsequently develop this property. Petitioner counters that he is entitled to deduct the real estate taxes because section 263A does not apply. Petitioner contends

that he acquired and held the property for investment purposes, there has been no physical change to the property, and it was not reasonably likely that he would subsequently develop the property once he acquired it.

Section 263A provides:

> (a) Nondeductibility of Certain Direct and Indirect Costs.--
>
> > (1) In general.--In the case of any property to which this section applies, any costs described in paragraph (2)--
> >
> > > (A) in the case of property which is inventory in the hands of the taxpayer, shall be included in inventory costs, and
> > >
> > > (B) in the case of any other property, shall be capitalized.
> >
> > (2) Allocable costs.--The costs described in this paragraph with respect to any property are-
> >
> > > (A) the direct costs of such property, and
> > >
> > > (B) such property's proper share of those indirect costs (including taxes) part or all of which are allocable to such property.

Real estate taxes qualify as an "indirect cost" that must be capitalized under section 263A if this section applies.  Sec. 1.263A-1(e)(3)(ii)(L), Income Tax Regs.  Section 263A applies to property "produced" by the taxpayer.  Sec. 263A(b)(1).  Section 263A(g)(1) defines the term "produce" to include "construct, build, install, manufacture, develop, or improve."  Congress intended the term "produce" to be broadly construed.  See Reichel

v. Commissioner, 112 T.C. 14, 17 (1999) (citing Von-Lusk v.
Commissioner, 104 T.C. 207, 215 (1995)).  Further, the
regulations provide:

> If property is held for future production, taxpayers
> must capitalize direct and indirect costs allocable to
> such property (e.g., purchasing, storage, handling, and
> other costs), even though production has not begun.  If
> property is not held for production, indirect costs
> incurred prior to the beginning of the production
> period must be allocated to the property and
> capitalized if, at the time the costs are incurred, it
> is reasonably likely that production will occur at some
> future date.  Thus, for example, a manufacturer must
> capitalize the costs of storing and handling raw
> materials before the raw materials are committed to
> production.  In addition, a real estate developer must
> capitalize property taxes incurred with respect to
> property if, at the time the taxes are incurred, it is
> reasonably likely that the property will be
> subsequently developed.  [Emphasis added.]

Sec. 1.263A-2(a)(3)(ii), Income Tax Regs.

In 1995, the year in which the real estate taxes were paid,
petitioner filed a document with the County outlining plans to
subdivide the property.  Petitioner testified that he filed the
application to change the zoning of the property from SPA to
residential zoning because the SPA zoning was depressing the
value of his property.  Petitioner also testified:  "I filed this
application to give attention to County of Sacramento.  My
properties are ready to be developed".

We have rejected arguments that a physical change to the
property is required for the capitalization of costs.  See Von-
Lusk v. Commissioner, supra at 218.  In addition, we have held
that our determination as to whether development will occur is
unaffected by local regulations that may delay or eventually

preclude the development from going forward.  Id. at 220.  We also note that we make this determination at the time the taxes are paid or incurred, not at the time the taxpayer acquired the property.  Sec. 1.263A-2(a)(3)(ii), Income Tax Regs.  Therefore, it is not dispositive to our determination whether Calvine 120/140 had undergone physical changes as of the time those taxes were paid, that the zoning restrictions may hinder or ultimately prohibit development, or that petitioner initially acquired the property for investment purposes.

On the basis of the evidence, we conclude that it was petitioner's intention and reasonably likely that Calvine 120/140 would be subsequently developed when the taxes were paid in 1995.  Therefore, we hold that the amounts paid for real estate taxes for the property must be capitalized during the 1995 taxable year.

V.   Payment to Consolidated Electrical Distributors

Respondent argues that petitioner may not deduct a $7,472 payment to Consolidated Electrical Distributors in 1995 because petitioner did not present any evidence as to the business purpose of the payment.  Although the payment was made from a business account of petitioner's, respondent points to instances in which petitioner paid personal expenses from this bank account.  Petitioner counters that there could have been no other purpose for the payment but for a business purpose.  We agree with respondent.

Deductions are a matter of legislative grace, and petitioner bears the burden of proving that he is entitled to the deductions claimed.  Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. at 440.  Ordinarily, a taxpayer is permitted to deduct the ordinary and necessary expenses that he pays or incurs during the taxable year in carrying on a trade or business.  Sec. 162(a).  A taxpayer, however, is required to maintain records sufficient to establish the amounts of his deductions.  Sec. 6001; sec. 1.6001-1(a), Income Tax Regs.

Petitioner conceded that some expenses paid from his business bank account were not for business purposes.  Petitioner presented no evidence to establish the business purpose of this payment.  Accordingly, we hold that petitioner is not allowed to deduct the payment to Consolidated Electrical Distributors in 1995.

In reaching all of our holdings herein, we have considered all arguments made by the parties, and to the extent not herein discussed, we find them to be irrelevant or without merit.

To reflect the foregoing,

Decisions will be

entered under Rule 155.